## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ST. FRANCIS HOLDINGS, LLC and**
**FRANCIS J. AVERILL, M.D.**

      **Plaintiffs,**

**v.**                                                      **Case No. 8:20-CV-1101-T-02AAS**

**CYNOSURE, INC. n/k/a**
**CYNOSURE, LLC, PAWNEE LEASING**
**CORPORATION, MMP CAPITAL, INC.,**
**and AMUR EQUIPMENT FINANCE, INC.**

      **Defendants.**

_____/

## AMENDED COMPLAINT

Plaintiffs, St. Francis Holdings, LLC ("St. Francis") and Francis J. Averill, M.D. ("Dr. Averill") by and through its undersigned counsel, sues Cynosure, Inc., now known as Cynosure, LLC ("Cynosure"), Pawnee Leasing Corporation ("Pawnee Leasing"), MMP Capital, Inc. ("MMP Capital"), and Amur Equipment Finance, Inc. ("Amur") (collectively "Defendants") and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff, St. Francis Holdings, LLC is a Florida limited liability company authorized to conduct business in Florida, with its principal place of business located in Pinellas County, Florida.

2.      Plaintiff, Francis J. Averill, M.D. is an individual who resides in Florida and serves as a managing member of St. Francis Holdings, LLC.  Dr. Averill is an award-winning physician who has earned board certifications in internal medicine, pulmonary medicine, critical care, and sleep medicine.

1

3.      Cynosure is a Delaware Company with its principal place of business in Massachusetts.

4.      Cynosure develops and manufactures a diverse range of treatment applications such as the SculpSure Non-Invasive Body Contouring Platform ("SculpSure System") and the TempSure Envi System ("TempSure System").

5.      Cynosure's customers include practitioners, physicians, aesthetic surgery practices, and business owners.  According to Cynosure's website, Cynosure serves 89 customers located within twenty-five (25) miles of downtown Tampa alone.  *See* Exhibit 1, Cynosure Website Find Provider Webpage.

6.      On information and belief, Cynosure maintains agents and representatives in Florida with which Cynosure used to solicit, negotiate, and interact with Plaintiffs in order to cause the Plaintiffs to execute the Cynosure Purchase Agreements.  These agents include and representatives include at least Cynosure's Director of Sales Growth, Kristopher Huston ("Huston"), who is based in the Tampa Bay area.  *See* Exhibit 11, Huston LinkedIn Biography. Huston called Plaintiffs and visited Plaintiffs' offices in Florida in connection with the solicitation of business from and sale of Cynosure products to Plaintiffs in Florida.

7.      Cynosure also maintains agents and representatives in Florida to offer continuing services and support to Florida-based customers, such as equipment installation, product training, and marketing services.  These agents and representatives include Account Managers and Customer Success Managers.  *See* Exhibit 3, Email from Cynosure Account Manager for North Florida.

8.      On or about June 26, 2019, St. Francis and Cynosure entered Customer Purchase Agreements in Florida relating to a SculpSure System and a TempSure System that were shipped

to Plaintiffs' offices in Florida and that are currently located in Plaintiffs offices in Florida.  *See* Exhibit 4, Cynosure Customer Purchase Agreements ("Cynosure Purchase Agreements").

9.    Cynosure's activities in Florida, related to the Cynosure Purchase Agreements, are what gave rise to the present dispute and Plaintiffs' injuries.

10.    Cynosure further conducts activities in Florida such that it has purposefully availed itself of the privileges of Florida law and, through its dealings with Plaintiffs, should reasonably anticipate being sued in Florida.

11.    Defendant Pawnee Leasing is incorporated in Colorado, with its principal place of business in Colorado.

12.    Pawnee Leasing's website boasts that it "conducts business in all of the lower 50 states of the U.S.," including Florida.  *See* Composite Exhibit 5, Pawnee Leasing About Webpage & Broker Contact Webpage, *available at* https://www.pawneeleasing.com/about/ and https://www.pawneeleasing.com/brokers/.

13.    Pawnee Leasing entered a lease agreement with St. Francis on June 26, 2019 ("Pawnee Lease Agreement") with Dr. Averill having signed the Lease Agreement as a Guarantor.  *See* Exhibit 6, June 26, 2019 Lease Agreement.

14.    The Pawnee Lease Agreement was entered in Florida and relates to equipment located in Plaintiffs' offices in Florida.

15.    Pawnee Leasing has directed communications to Plaintiffs in Florida relating to the Pawnee Lease Agreement.  *See* Exhibit 7, July 12, 2019 Letter from Pawnee Leasing to Plaintiffs.

16.    The Pawnee Lease Agreement contemplates that Pawnee would withdraw monthly lease payments from St. Francis's bank account in Florida, which has in fact occurred,

and that Pawnee would pay local property taxes due and owing in Florida on St. Francis's behalf. *See* Exhibit 7, July 12, 2019 Letter from Pawnee Leasing to Plaintiffs.

17.     Pawnee Leasing's activities in Florida, related to the Pawnee Lease Agreement, are what gave rise to the present dispute and Plaintiffs' injuries.  Pawnee Leasing further conducts activities in Florida such that it has purposefully availed itself of the privileges of Florida law and, through its dealings with Plaintiffs, should reasonably anticipate being sued in Florida.

18.     MMP Capital is incorporated in New York with its principal place of business in New York.

19.     On information and belief, MMP Capital solicits customers and conducts business in Florida, as evidenced at least by its business dealings with Plaintiffs and a customer testimony from one of MMP Capital's customers in Sarasota, Florida.  *See* Exhibit 8, MMP Capital Testimonial Webpage, *available at* https://www.mmpcapital.com/testimonials.

20.     On information and belief, MMP Capital maintains agents and representatives in Florida, including at least a Senior Vice President.  *See* Exhibit 9, MMP Capital About MMP Capital Webpage, *see* https://www.mmpcapital.com/about.

21.     MMP Capital entered an Equipment Finance Agreement with St. Francis on June 26, 2019 with Dr. Averill having signed finance agreement as a Guarantor ("Finance Agreement").  *See* Exhibit 10, Equipment Acceptance Certificate and Equipment Finance Agreement.  The MMP Capital Finance Agreement contemplates that MMP Capital would withdraw monthly lease payments from St. Francis's bank account in Florida, and MMP Capital has made such withdraws.

22.     The MMP Capital Finance Agreement was entered in Florida and relates to equipment located in Plaintiffs' offices in Florida.

23.    MMP Capital's activities in Florida, related to the MMP Finance Agreement, are what gave rise to the present dispute and Plaintiffs' injuries.  On information and belief, MMP Capital further conducts activities in Florida such that it has purposefully availed itself of the privileges of Florida law and, through its dealings with Plaintiffs, should reasonably anticipate being sued in Florida.

24.    Amur is incorporated in Nebraska, with its principal place of business in Grand Island, Nebraska.

25.    Amur, as assignee, entered a leasing agreement in 2019 having a contract No. 948659 ("Amur Lease Agreement").

26.    The Amur Lease Agreement relates to equipment located in Plaintiffs' offices in Florida.

27.    Amur recorded with the Florida Secretary of State a UCC Financing Statement relating to the Amur Lease Agreement, thereby evidencing an intent to avail itself of the protections of Florida law.  *See* Exhibit 11, Amur UCC Financing Statement.

28.    On information and belief, Amur further conducts activities in Florida such that it has purposefully availed itself of the privileges of Florida law and should reasonably anticipate being sued in Florida.

29.    Plaintiffs have a strong interest in obtaining relief against Cynosure, Pawnee Leasing, Amur, and MMP Capital.

30.    This is an action for damages in excess of $75,000.00, exclusive of interest, attorneys' fees, and costs.

31.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

32.    Venue is further proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claim occurred in Clearwater, Florida,

which is within the Middle District of Florida. Specifically, the acts or omissions related to those agreements executed by and between Cynosure, as well as the Pawnee Lease Agreement, MMP Capital Lease Agreement, and Amur Lease agreement.

## GENERAL ALLEGATIONS

### *June 26, 2019 Sales Pitch and the Financing Agreements*

33.     In 2015, Cynosure began selling the SculpSure Non-Invasive Body Contouring Platform ("SculpSure System") to physicians and aesthetic surgery practices in the United States. The marketing materials represent that the SculpSure System effectively eliminates unwanted fat cells and provides patients with non-invasive body contouring without surgery or downtime.

34.     Cynosure also markets and sells a TempSure Envi product ("TempSure System") as an effective way to reduce the appearance of wrinkles, including forehead wrinkles, frown lines, crow's feet, and smile lines.

35.     In or around June 2019, Huston "cold called" Plaintiffs offices to solicit business from Plaintiffs by seeking to sell Plaintiffs on the idea of establishing a new aesthetics practice through the purchase of two of Cynosure's so-called "hot ticket" products—the SculpSure System and the TempSure System.

36.     On or about June 26, 2019, Huston visited Plaintiffs' office in Clearwater, Florida and conducted a presentation on the SculpSure System and the TempSure System.  Dr. Averill attended the June 26 presentation.

37.     During the June 26, 2019 presentation, Huston, acting on behalf of Cynosure, Pawnee Leasing, and MMP Capital made a number of inflated claims and material misrepresentations and omissions concerning the efficacy, operation, and financing of the SculpSure and TempSure Systems.  The moment Plaintiffs expressed an interest in obtaining a SculpSure System, Huston pounced.  Huston hastily presented Plaintiffs with a series of

convoluted contract instruments intended to beguile Plaintiffs into believing that they were being given an option to secure cutting edge products at a reasonable monthly price that were perfect for a startup aesthetics practice.  The reality of the matter is, however, that Huston was putting the finishing touches on Defendants' deceptive scheme that attempts to lock customers like St. Francis into a series of payment obligations, supposedly with no recourse, in exchange for equipment that is not nearly as patient or provider friendly as Cynosure represents.

38.    Prior to the June 26, 2019 presentation, Huston knew that St. Francis did not have an aesthetics practice and that St. Francis's principal areas of medical practice are sleep, allergy, and pulmonology.  But Huston nevertheless pitched the SculpSure and TempSure systems as well suited to serve as starting points for a new aesthetics practice that would generate significant revenue in a matter of months.

39.    More specifically, Huston told Plaintiffs that St. Francis could expect to generate approximately $30,000 per month in revenue from performing procedures using the SculpSure system and generate an additional $10,800 per month from website and social media promotions. According to Huston, if just 1% of Plaintiffs' patient base were to elect to undergo SculpSure procedures, Plaintiffs would earn $18,000 per month.

40.    Huston represented that the use of the SculpSure and TempSure Systems were virtually "pain-free" for patients, and patients using the SculpSure System would experience a 25% reduction in fat after just twenty-four minutes.

41.    Huston also represented during the June 26, 2019 presentation that the SculpSure System could be used "hands free" making it an ideal starting point for a new practice.  More specifically, Huston claimed that the SculpSure system could be set up by a medical assistant, and procedures could be initiated by a provider who then did not need to be present while the procedure was ongoing.

42.    Huston pushed the TempSure System as the "next thing" that Cynosure customers typically purchase at the same time as or right after purchasing the SculpSure System and as likewise being a good fit for a new aesthetics practice.

43.    Huston assured Plaintiffs that Cynosure would provide support for Plaintiffs' new business venture as St. Francis embarked on a new practice area.    In particular, Huston represented that Cynosure could provide financing for the equipment and that payments would be deferred for the first six (6) months after signing.

44.    Additionally, as part of the marketing and inducement to purchase the SculpSure and TempSure Systems, Huston also represented on behalf of Cynosure that Cynosure would provide a 'marketing rebate check' in the amount of $26,750.00 within 6 to 8 weeks—a promise that was later restated and confirmed by Cynosure orally and in writing.  *See* Exhibit 12, Aug. 30, 2019 Letter from Cynosure.

45.    During a phone call on July 2, 2019, Cynosure Customer Service Manager, Joshua Smith, again confirmed that Cynosure would provide the marketing rebate check in the amount of $26,750.00.  An August 7, 2019 letter from Cynosure's CEO, Erik Anderson, once again promised that a marketing rebate check would be provided.

46.    To date, Cynosure has failed to provide the agreed marketing rebate check.

47.    During the June 26, 2019 meeting, Huston sought to create a sense of urgency by stating that the SculpSure System equipment was on back order and that Plaintiffs would need to order the system promptly to ensure timely availability of the equipment.  Huston further relayed that purportedly the only reason Huston had the SculpSure System equipment available was because he was starting a new Cynosure division in the Tampa Bay area.

48.    Based on Huston's representations during the June 26, 2019 sales presentation, Plaintiffs expressed an interest in purchasing the Cynosure SculpSure System—but not the

TempSure System.  In response, Huston, acting on behalf of Defendants Cynosure, Pawnee Leasing, and MMP Capital, presented Plaintiffs with paperwork relating to both systems, including the two Cynosure Purchase Agreements, the Pawnee Lease Agreement, and the MMP Capital Finance Agreement.  Huston even provided the agreements predated and preprinted with the last four digits of Dr. Averill's social security number, Dr. Averill's home address, and St. Francis's tax payer ID.

49.    Plaintiffs executed the agreements the same day as Huston's presentation.

50.    Plaintiffs did not receive fully executed copies of the Pawnee Lease Agreement or the MMP Capital Finance Agreement on June 26, 2019 signed by a representative of Pawnee Leasing or MMP Capital.  Huston even tried leaving Plaintiffs' offices without providing Plaintiffs with copies of any of the agreements signed by Plaintiffs on June 26.

51.    Plaintiffs subsequently obtained a fully executed copy of the Pawnee Lease Agreement indicating that Pawnee Leasing did not sign the Pawnee Lease Agreement until July 11, 2019—after the SculpSure System and the TempSure System were delivered to Plaintiffs' office.

52.    Curiously, the MMP Capital Finance Agreement that Huston presented to Plaintiffs for signing was accompanied by an Equipment Acceptance Certificate falsely stating that "**As of the Acceptance Date set forth below, you hereby confirm that (i) the equipment listed in the attached Schedule A (the Equipment) has been delivered to you, installed, and/or is operating as intended**." *See* Exhibit 10 at pg. 1.

53.    Of course, contrary to the statement in the Equipment Acceptance Certificate, neither the SculpSure System nor the TempSure System was delivered and installed on the same day as Huston's presentation.  Huston said nothing to suggest that Plaintiffs would be required to accept the equipment "as is" prior to the equipment even being delivered.

54.     The Pawnee Leasing Agreement was likewise inaccurate and less than pellucid with regard to the delivery, installation, and acceptance of the SculpSure System equipment. Section 1 of the Pawnee Lease Agreement directs that St. Francis "must notify [Pawnee Leasing] in writing immediately if [St. Francis] reject[s] the Equipment when it is delivered." *See* Exhibit 6, Pawnee Lease Agreement § 1.  But § 1 of the Pawnee Lease Agreement Addendum directs Pawnee Leasing to pay Cynosure the contract price for the SculpSure System based on "[St. Francis's] complete satisfaction of [sic] the Equipment as it is now" with St. Francis supposedly agreeing "that the Equipment is irrevocably accepted for all purposes."  *See* Exhibit 6, Addendum to Lease Agreement § 1.  In short, the Addendum indicates that payment to Cynosure was somehow conditioned on Plaintiffs pre-delivery, irrevocable acceptance of the SculpSure System equipment.

55.     With regard to the monthly payments, although Huston represented that payments would be deferred for six (6) months, both the Pawnee Lease Agreement and the MMP Capital Finance Agreement indicated that monthly installment payments of $99 were owed for the first six (6) months.  *See* Exhibits 6 & 10.

56.     After the first six (6) months, the Pawnee Lease Agreement provided that the monthly payments would be set at $4,662.12 for the SculpSure System, and the MMP Capital Finance Agreement provided that the monthly payments would be $3,349.29 for the TempSure System.  *See* Exhibits 6 & 10.

57.     Neither the Pawnee Lease Agreement nor the MMP Capital Finance Agreement reveals an interest rate or explains the bases for how the payment amounts were calculated.  The MMP Capital Finance Agreement does not specify the principal amount supposedly being financed.  *See* Exhibits 6 & 10.

58.    During his presentation, Huston never revealed that Cynosure would require the SculpSure and TempSure Systems to be leased from third parties.  And Huston never explained the terms of the lease or finance agreements.

59.    Contrary to both Huston's representations and the plain language of the Pawnee Lease Agreement and MMP Capital Finance Agreement, Defendants soon began indiscriminately charging St. Francis and syphoning funds from its bank account.

60.    More particularly, Plaintiffs received an invoice from Pawnee Leasing on July 17, 2019 in the amount of $3,263.48 stating that the invoice was payable upon receipt.  Pawnee also withdrew from St. Francis's bank account $350 on July 15, 2019 and $99 on August 1, 2019.

61.    St. Francis's bank account was also hit with two automated withdrawals from entities mentioned nowhere in the agreements signed by Plaintiffs, including: (i) a withdrawal of $499 from Amur Equipment on July 17, 2019; and (ii) a withdrawal of $99 from Axis Capital on August 2, 2019.

***The Picture Painted by Huston's Sales Pitch Unravels***

62.    Meanwhile, in or around early July 2019, the equipment for the SculpSure and TempSure Systems was delivered to Plaintiffs' offices.  In the weeks following delivery of the equipment, the equipment was assembled and installed.  Plaintiffs retained an electrician to upgrade electrical outlets in Plaintiffs' offices to accommodate the SculpSure and TempSure Systems as part of the installation.

63.    Once assembled, Plaintiffs were never able to begin using either the SculpSure or TempSure systems because Cynosure did not send a representative to train Plaintiffs how to use the systems, as Cynosure previously promised it would do.

64.    Cynosure stated that a representative would visit St. Francis to provide the required training.  St. Francis cancelled patient appointments and refrained from scheduling

appointments so that staff would be available to attend the training, and St. Francis paid staff to be at work for those days during which training was to occur. But the Cynosure representative did not show up for the scheduled training session.

65.     On or about July 2, 2019, Plaintiffs did receive a visit from Cynosure Sales Manager, Patrick Ryan ("Ryan"), who invited Plaintiffs to attend a Cynosure conference at the Fontainebleau Hotel in Miami Beach, Florida the weekend of August 2-4, 2019. Ryan originally agreed that Cynosure would reserve and pay for five (5) rooms at the conference for Plaintiffs. But Ryan came back to Plaintiffs' office to ask for Plaintiffs' own credit card to reserve the rooms before Cynosure eventually informed Plaintiffs that Cynosure would only pay for a single room. Following the actual conference, Plaintiffs were charged for the reserved room.

66.     In the meantime, Plaintiffs learned that Cynosure had become embroiled in litigation over alleged false representations relating to the SculpSure System, including the same representation made to and relied upon by Plaintiffs that the procedures using the SculpSure were "pain free."

67.     Shortly after learning about the Cynosure litigation, in or around July 25, 2019, Plaintiffs contacted Pawnee Leasing and requested that Pawnee accept return of the SculpSure System equipment and cancel the agreements. Pawnee Leasing refuse stating it had already paid Cynosure and that the agreement could not be rescinded or cancelled.

68.     On or about July 26, 2019, Plaintiffs also spoke with John-Paul Smolenski, president of MMP Capital. Plaintiffs informed Mr. Smolenski of Plaintiffs' intent to cancel the MMP Capital Finance Agreement and to return the TempSure System equipment in part because Plaintiffs learned that the system was not virtually "pain free." Similar to Pawnee Leasing, Mr. Smolenski maintained that the Finance Agreement was non-cancellable. Mr. Smolenski further

represented that he had received treatment using the equipment and that he did not consider the treatment to be painful.

69.     Plaintiffs also called Huston to inform him that Plaintiffs were exercising their right to reject or revoke any acceptance of the SculpSure and TempSure System equipment and to rescind the agreements with Cynosure.  In response, Huston referred Plaintiffs to a Cynosure manager, Mike Russo ("Russo").

70.     Russo called Plaintiffs on or about July 25, 2019, and reiterated the representation that the SculpSure System procedures were virtually pain free.  Russo described the SculpSure system as a "blockbuster" product and assured Plaintiffs that the litigation against Cynosure would be resolved.

71.     Russo reported that he had personally received three treatments and that they were not painful.  Russo estimated that 99% of St. Francis's patients would be "fine."

72.     Russo encouraged Plaintiffs' to attend the Miami Beach conference where Cynosure would demonstrate the use of the SculpSure System on actual patients—which Cynosure supposedly would not do if the procedure were too painful—and where Plaintiffs would have an opportunity to try the SculpSure System themselves to experience how the procedure felt.  Russo offered to discuss cancelling the purchase/lease of the SculpSure and TempSure equipment if Plaintiffs were still not satisfied following the conference.

73.     Cynosure touted the Miami Beach conference as featuring a number of aesthetic industry experts and marketing sponsors, where Cynosure customers could leave confident and able to expand their practices with profitable Cynosure products.  Both Dr. Averill and Rose Averill, the Chief Executive Officer of St. Francis Sleep, Allergy and Lung Institute, LLC, which operates the St. Francis clinic, attended the conference in Miami Beach.

74.    During the August 3-4 Miami Beach conference, which Russo attended, Plaintiffs reached out to Russo multiple times and requested an opportunity to try the SculpSure System themselves, as promised by Russo.  But Russo never met with Plaintiffs, and Plaintiffs were not permitted an opportunity to try the SculpSure System themselves or even see the treatment areas up close on the live demonstration models.

75.    Critically, Plaintiffs did learn for the first time from the demonstrations and from speaking with others at the conference that use of SculpSure and TempSure Systems require the use of anesthesia, which indicates the procedures are not, in fact, virtually "pain free" or "hands free."

76.    The live demonstrations were conducted using the anesthetic Nitrous Oxide ("Nitrox") on the demonstration models, and Cynosure sold anesthesia products at the conference.

77.    Cynosure offered for sale and did in fact sell a variety of product during the conference.  Cynosure stated to Plaintiffs that Cynosure did not accept cash for the purchase of products but instead required financing through third parties.

78.    Moreover, although Cynosure emphasized procedures using its equipment are handled primarily by medical assistants, it became clear during the demonstrations that use of the Cynosure products was more complex and risky than Cynosure had previously led Plaintiffs to believe.  It was evident that the Cynosure procedures, including use of the SculpSure and TempSure Systems, would require significant training and personnel resources.

79.    The required use of anesthesia necessarily means that, contrary to Huston's representations, the procedures are not "hands free" as patients would need to be monitored during procedures using the SculpSure and TempSure Systems, and the procedures would require the attention of a physician and could not be performed by a nurse practitioner or medical

assistant.  In fact, the State of Florida requires a sedation permit as well as formal training in the use of conscious sedation.

80.    Additionally, Nitrous Oxide is known to present significant risks for patients experiencing certain pulmonary conditions or ailments, such as COPD or upper respiratory tract infections.  Given that St. Francis is a pulmonary practice, many of St. Francis's patients would not elect or be eligible to undergo procedures using the SculpSure and TempSure Systems.

81.    St. Francis also treats many patients who are significantly obese and are impacted by problems such as sleep apnea and lipedema.  However, the SculpSure system is not indicated for use with obese patients who have a body mass index above 30 or who suffer from lipedema, and SculpSure is instead intended for use in patients who are within 10 to 20 pounds of their ideal body weight.  This further limits the number of St. Francis patients who might elect or be eligible to undergo procedures using the SculpSure and TempSure Systems.

82.    The need for constant patient monitoring by medical staff, the required involvement of a physician, and the need for significant training all contradict Huston's representations that the SculpSure and TempSure Systems are well suited as centerpieces for a brand new aesthetics practice—particularly a practice such as St. Francis's.  The reality is that substantial costs in personnel and other resources are required to set up and maintain a practice using the SculpSure and TempSure Systems.  Further, the revenue amounts highlighted by Huston could not be achieved by St. Francis so as to achieve a return on investment for the SculpSure System and TempSure System equipment.

83.    During the conference, Plaintiffs met with one of Cynosure's speakers, Dr. Dianne Quibell and her colleague, Flo Goshgarian.  Dr. Quibell confirmed that use of the SculpSure System required an anesthetic.

84.    Dr. Quibell and Ms. Goshgarian also relayed that the SculpSure and TempSure Systems were not suitable for starting an aesthetics practice and that instead, these systems are more suitable for established aesthetics practices in part because of the price points for procedures using the systems.

85.    With regard to the price point, Cynosure maintains policies requiring that procedures using its products, including the SculpSure and TempSure Systems, are subject to certain minimum charges and restrictions with regard to sales and discounts.  For the SculpSure and TempSure Systems, the minimum price points are significant such that only a relatively small subset of patients would elect or even be able to regularly afford procedures using the systems.  As a result, an aesthetic practice would require a substantial client base—which a new practice would not have—to have enough patients that would elect to receive treatments using the SculpSure and TempSure Systems such that the systems would be profitable.

86.    In short, following the Miami Beach conference, it became clear that the pricing, the complexity, the need for anesthesia, the required medical training and monitoring, and need for physician oversight all cut squarely against Huston's statements that the SculpSure and TempSure Systems are suitable for starting a new aesthetics practice given the substantial equipment and personnel costs and the difficulty of achieving a significant sales volume for a new practice.

87.    Immediately following the Miami Beach conference on August 7, 2019, St. Francis sent Cynosure a notice cancelling the purchase/lease of the SculpSure System and TempSure System equipment.  The August 7, 2019 cancellation notice stated that the equipment had not been used and tendered return of the equipment back to Cynosure.  *See* Exhibit 13, Aug. 7, 2019 Letter from F. Averill to Cynosure.

88.     Cynosure refused to cancel the purchase/lease of the equipment or to accept the return of the equipment.  *See* Exhibit 12.

89.     Pawnee Leasing responded by likewise refusing to cancel the purchase/lease of the SculpSure System.   According to Pawnee Leasing, the Lease Agreement was non-cancellable, and Pawnee Leasing had already paid Cynosure a principal amount under the lease. *See* Exhibit 14, Aug. 8, 2019 Email from Pawnee Leasing to Averill.  Instead of permitting cancellation of the Lease Agreement, Pawnee Leasing instead quoted a purchase price of $258,031.51—an amount that is $53,000.00 more than the original represented value set out in the purchase/lease documents.  *Compare* Exhibit 14, *with* Exhibit 6, Pawnee Lease Agreement.

90.     The equipment cannot be used in the way that Cynosure marketed them to Plaintiffs.  And in fact, the equipment remains unused to this day.

91.     St. Francis did not receive the benefit of the bargain, and has suffered actual damages in the form of having to make lease payments and carrying expensive insurance for the equipment under the threat by at least Pawnee Leasing's failure to carry insurance would result in Pawnee Leasing force placing insurance at a significant cost to St. Francis Institute.

92.     Plaintiffs have retained the undersigned law firm in this action and has agreed to pay the firm a reasonable fee for the services rendered.

93.     All conditions precedent to this action have been performed, occurred, or waived.

## COUNT I

### FRAUD IN THE INDUCEMENT

**By St. Francis and Dr. Averill against Cynosure, Pawnee Leasing, and MMP Capital**

94.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 93 as though fully set forth herein.

95.     Cynosure acting through Huston as its representative during a meeting on June 26, 2019, falsely claimed that: (i) use of the SculpSure System was virtually painless; (ii) procedures using the SculpSure System could be performed "hands free" without a trained staff member needing to be present during the majority of the treatment; and (iii) that the SculpSure and TempSure systems were well suited for establishing a new aesthetics practice.  Huston knew that these representations were false at the time they were made.

96.     At no time prior to the Miami Beach conference did Defendants reveal that procedures using the SculpSure and TempSure Systems would require Nitrous Oxide or any other form of anesthesia.

97.     On June 26, 2019, Defendants Cynosure, Pawnee Leasing, and MMP Capital, acting through Huston as their agent failed to disclose (i) that Defendants would ask Plaintiffs to agree that the TempSure equipment had already been delivered, installed, and was operational when, in fact, none of these conditions were met, or (ii) that Defendants would seek to procure Plaintiffs' acceptance of the SculpSure System and TempSure System equipment prior to actual delivery of the equipment to Plaintiffs, such that Defendants would refuse to accept return of the equipment or cancellation of the Cynosure Purchase Agreements, Pawnee Lease Agreements, and MMP Capital Finance Agreement.

98.     At the time of the June 26, 2019 meeting, Huston was aware of the material omissions and misrepresentations concerning the acceptance, delivery, installation, and operational condition of the SculpSure and TempSure Systems and aware that Defendants were omitting such facts and making such misrepresentation so that Cynosure could secure immediate payment from Pawnee Leasing and MMP Capital and so that Defendants could claim that the Cynosure Purchase Agreements, the Pawnee Lease Agreements, and MMP Capital Finance Agreement were irrevocable and non-cancellable.

99.     The representations and omissions made by Cynosure are false statements or omissions made concerning material facts in that: (i) the use of the SculpSure System or use of the TempSure System are not virtually painless for patients; (ii) neither system can be effectively used "hands free" without a trained staff member needing to be present during procedures; (iii) the SculpSure and TempSure systems are not well suited for establishing a new aesthetics practice and in particular not well suited for St. Francis's patient base; and (iv) Plaintiffs would not have entered the agreements knowing that Cynosure, Pawnee Leasing, and MMP Capital would refuse to accept return of the equipment or cancellation of the agreements based on the request that Plaintiffs stipulate to pre-delivery acceptance of the equipment or that Plaintiffs stipulate and agree to conditions that were not true—*i.e.*, that the equipment was already delivered, installed, and operational.

100.     On June 26, 2019, Cynosure acting through Huston as its representative, orally represented that Cynosure would provide St. Francis with a marketing rebate check in the amount of $26,750.00.  Cynosure restated and/or affirmed this representation orally and in writing in an August 30, 2019 letter.  *See* Exhibit 12.

101.     The representations concerning the marketing rebate are false statements of material fact in that at the time the statements were made, Cynosure did not intend to honor the rebate.

102.     Defendants made the aforementioned false representations with the intent that Plaintiffs rely on the false representations in order to induce Plaintiffs to execute and/or enter into the Cynosure Purchase Agreements, Pawnee Lease Agreement, and the MMP Capital Finance Agreement, one of which was later assigned to Amur.

103.    Plaintiffs did, in fact, justifiably rely upon the false representations in entering the Cynosure Purchase Agreements, Pawnee Lease Agreement, and MMP Capital Finance Agreement.

104.    But for the express representations and material omissions made by Defendants through Huston, Plaintiffs would not have entered the agreements or the transaction in general to purchase/lease the SculpSure System and TempSure System equipment.

105.    As a result of Defendants' fraudulent inducement, St. Francis has suffered damages including, but not limited to, lease payments to Pawnee Leasing, MMP Capital, and Amur.

WHEREFORE, Plaintiffs demand judgment rescinding the Cynosure Purchase Agreements, Pawnee Lease Agreement, MMP Capital Finance Agreement, and Amur Lease Agreement, or alternatively, the entry of a judgment for all damages, prejudgment and post-judgment interest, attorneys' fees, costs, and all other relief this Court deems necessary, just and proper.

## COUNT II

### BREACH OF CONTRACT

**By St. Francis and Dr. Averill against Cynosure
for Non-Payment of Marketing Rebate Check**

106.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 93 as though fully set forth herein.

107.    Cynosure agreed to pay, and St. Francis agreed to accept, a 'marketing rebate check' in the amount of $26,750.00.

108.    The agreement for payment of the marketing rebate check was established through Cynosure's oral representations to Plaintiffs by Huston as Cynosure's representative on or about June 26, 2019.

109.    Cynosure repeated this representation in an August 30, 2019 letter and again promised that the $26,750.00 would be provided.  *See* Exhibit 13.

110.    Cynosure's representations that it would provide the marketing rebate check were clear, precise, and indubitable, and constitute a binding promise to pay.

111.    Cynosure's representations that it would provide the marketing rebate check constitutes a stand-alone agreement made in consideration for Plaintiffs entering the Cynosure Purchase Agreements.

112.    Alternatively, Cynosure's representations that it would pay St. Francis a marketing rebate check constitutes a material, mutually negotiated and agreed, binding term of, or modification to, the Cynosure Purchase Agreements, which was accepted by St. Francis.

113.    Cynosure breached the agreement to pay St. Francis a marketing rebate check including, but not limited to, the covenant of good faith and fair dealing contained in such agreement, by failing to pay St. Francis the agreed marketing rebate check.

114.    Alternatively, Cynosure breached the Cynosure Purchase Agreements, including but not limited to, the covenant of good faith and fair dealing contained in such agreement, by failing to pay St. Francis the agreed marketing rebate.

115.    Cynosure's breach of the stand-alone agreement, or breach of Cynosure Purchase Agreement, by failing to pay the marketing rebate check has caused damage to St. Francis.

WHEREFORE, Plaintiffs demand entry of a judgment for all damages, prejudgment and post-judgment interest, attorneys' fees, costs, and all other relief this Court deems necessary, just and proper.

## COUNT III

**VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**By St. Francis and Dr. Averill against all Defendants**

116.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 105 hereof as though fully set forth herein.

117.    The above acts by Cynosure constitute unfair and deceptive trade practices under Florida Statutes Sections 501.201 *et seq*.

118.    Cynosure solicited Plaintiffs and falsely and deceptively marketed the SculpSure and TempSure Systems as being well suited for St. Francis to establish a new aesthetics practice. Cynosure further marketed the SculpSure System to Plaintiffs through material, false representations concerning the function and operation of the system, including that the SculpSure System could be used without causing pain to patients and used "hands free" without a trained staff member needing to be present during the majority of the treatment.

119.    Cynosure intentionally and improperly attempted to bolster the credibility of its false representations by repeating variations of the representations through its advertising, its agents such as Mike Russo, as well by conducting presentations and live demonstrations of the SculpSure and TempSure Systems designed to deceive customers regarding the function and operation of the system.

120.    MMP Capital, through its president, Smolenski, likewise attempted to bolster the credibility of the false statement that use of the Cynosure equipment was virtually "pain free" by relaying to Plaintiffs that Smolenski had undergone treatment, without pain, using the SculpSure System.

121.   Contrary to the representations alleged herein, at no time during marketing of SculpSure System to Plaintiffs did Cynosure report that patients would feel pain, or require any anesthesia after the use of the equipment.

122.   Cynosure further marketed the SculpSure System to Plaintiffs through promises of a marketing rebate check that were never delivered.

123.   On June 26, 2019, Defendants Cynosure, Pawnee Leasing, and MMP Capital, acting through Huston as their agent, engaged in deceptive and unfair business practices by failing to disclose (i) that Defendants would ask Plaintiffs to agree that the SculpSure and TempSure equipment had already been delivered, installed, and was operational when, in fact, none of these conditions was met, or (ii) that Defendants would seek to procure Plaintiffs' acceptance of the SculpSure and TempSure equipment prior to actual delivery of the equipment to Plaintiffs' offices, such that Defendants would refuse to accept return of the equipment or cancellation of the Cynosure Purchase Agreements, the Pawnee Lease Agreements, and MMP Capital Finance Agreement.

124.   Defendants Cynosure, Pawnee Leasing, and MMP Capital, acting through Huston as their agent, engaged in deceptive and unfair business practices by presenting Plaintiffs with agreements on June 26, 2019 that asked Plaintiffs to accept equipment that had not been delivered and by seeking Plaintiffs' stipulation and agreement to facts that were not true, including that the TempSure System equipment had been delivered, installed, and been made operational, when, in fact, the equipment had not even been delivered.

125.   Defendants sought Plaintiffs' acceptance of the undelivered equipment and stipulation to misrepresentations concerning the delivery, installation, and operational nature of the SculpSure System and TempSure System equipment so that Cynosure could secure immediate payment from Pawnee Leasing and MMP Capital and so that Defendants could claim

that the Cynosure Purchase Agreements, the Pawnee Lease Agreements, and MMP Capital Finance Agreement were irrevocable and non-cancellable.

126.   Defendants further engaged in deceptive and unfair business practices by immediately commencing unauthorized withdrawals from St. Francis's bank account from Amur and Axis Capital, which were entities never disclosed to Plaintiffs, and by sending Plaintiffs an invoice from Pawnee Leasing in or around July 12, 2019 in the amount of $3,263.48 in violation of the Pawnee Lease Agreement.

127.   Cynosure's false representations made to Plaintiffs, buttressed by Cynosure's misleading promotional practices, and Defendants' scheme to seek Plaintiffs' purportedly irrevocable acceptance of equipment that had not been delivered, were all practices likely to deceive customers such as St. Francis acting reasonably under the circumstances into purchasing or leasing equipment from Defendants and continuing to make payments notwithstanding any demands to return the equipment.

128.   Defendants Cynosure, Pawnee Leasing, MMP Capital, and Amur have engaged in unfair or deceptive trade practices in the conduct of trade and commerce through the acts alleged herein.

129.   As a direct and proximate cause of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages.

WHEREFORE, Plaintiffs demand entry of a judgment for all damages, prejudgment and post-judgment interest, attorneys' fees, costs, and all other relief this Court deems necessary, just and proper.

## COUNT IV

### RESCISSION

**By St. Francis and Dr. Averill against all Defendants**

130.    Plaintiffs incorporate paragraphs 1 through 105 hereof as though fully set forth herein.

131.    Plaintiffs were fraudulently induced into entering the Cynosure Purchase Agreement, Pawnee Lease Agreement, and MMP Capital Finance Agreement through Defendants' various false representations and omissions and Defendants' deceptive and unfair trade practices.

132.    The SculpSure System and TempSure System are unsuitable for the purpose for which they were purchased or leased in that neither system is suitable for establishing a new aesthetics practice—particularly for a pulmonary medical practice with a patient base like St. Francis's.

133.    Defendants Cynosure, Pawnee Leasing, MMP Capital's actions were conscious and deliberate and resulted in a frustration of the purpose of the agreements, made the agreements impossible to perform and contravened Plaintiffs' reasonable commercial expectations that the SculpSure System and TempSure System equipment would be suitable for the intended purpose for which the equipment was purchased or leased—*i.e.*, to establish a new aesthetics practice.

134.    Defendants, acting through Huston as their agent, induced Plaintiffs into executing agreements premised on mistakes and false statements in that the agreements sought to require Plaintiffs to accept equipment that had not been delivered and to stipulate and agree that the TempSure System equipment had already been delivered, installed, and placed in operational condition when, in fact, it had not.

135.    On or about July 25, 2019, July 25, and again on August 7, 2019, Plaintiffs notified Defendants that Plaintiffs were cancelling and/or rescinding the agreements and

rejecting the SculpSure System and TempSure System equipment. Plaintiffs offered to return the equipment in an unused condition.

136.    Plaintiff took steps to reject and offer the return of the SculpSure and TempSure System equipment, and took steps to cancel and/or rescind the agreements with Defendants, in a reasonable time frame following delivery of the equipment to Plaintiffs.

137.    Plaintiffs reached out to Huston, Russo, Pawnee Leasing, and MMP Capital on or about July 25 and 26, 2019, promptly after learning that the SculpSure System and TempSure System were marketed to Plaintiffs under false pretenses. And after Plaintiffs were urged by Cynosure to reconsider following attendance at the August 3-4 Miami Beach conference, Plaintiffs again acted promptly in sending a cancellation, rejection, and rescission notice to Cynosure, Pawnee Leasing, and MMP Capital on August 7, 2019.

138.    Plaintiffs are ready, willing and able to return the SculpSure System and TempSure System equipment in the same condition as when they were delivered.

139.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment rescinding the Cynosure Purchase Agreement, Pawnee Lease Agreement, MMP Capital Finance Agreement, and Amur Lease Agreement.

## COUNT V

### CIVIL CONSPIRACY

**By St. Francis and Dr. Averill**
**against Cynosure, Pawnee Leasing, MMP Capital, and Amur Leasing**

140.    Plaintiffs incorporate paragraphs 1 through 105 hereof as though fully set forth herein.

141.   Plaintiffs were fraudulently induced into entering the Cynosure Purchase Agreement, Pawnee Lease Agreement, and MMP Capital Finance Agreement through Defendants' various false representations and omissions and Defendants' deceptive and unfair trade practices.

142.   Defendants authorized Huston as their agent to present agreements to Plaintiffs that sought Plaintiffs' irrevocable acceptance of SculpSure and TempSure System equipment that had not been delivered and that sought Plaintiffs' agreement and stipulation to statements that were not true concerning the delivery, installation, and operational nature of the TempSure System equipment.

143.   Defendants sought Plaintiffs' supposed pre-delivery irrevocable acceptance of Cynosure equipment to further a scheme whereby Pawnee Leasing and MMP Capital would issue immediate payment to Cynosure such that Defendants could then claim the agreements and concomitant payment obligations were non-cancellable and irrevocable notwithstanding any rejection of or offers to return the Cynosure equipment, and whereby Defendants could commence unauthorized withdrawals from St. Francis's bank account and the issuance of false, out-of-cycle invoices.

144.   Defendants Pawnee Leasing, MMP Capital, and Amur were aware of and authorized Cynosure's false and deceptive sales and promotional practices claiming that use of the Cynosure equipment was virtually "pain free."  MMP Capital's president even repeated this false and misleading representation during a call with Plaintiffs on July 26, 2019.

145.   Pawnee Leasing, MMP Capital, and Amur acted together and in concert with Cynosure to consummate a sale and/or financing of the SculpSure and TempSure systems.

146.   Further, Pawnee Leasing, MMP Capital, and Amur, with knowledge of Cynosure's intent to market the SculpSure and TempSure Systems, while utilizing

misrepresentations regarding the capabilities and characteristics of these machines, took overt acts in pursuance of the conspiracy by causing lease and/or financing agreements to be executed with Plaintiffs—specifically the Pawnee Lease Agreement and MMP Capital Lease Agreement one of which was evidently assigned to Amur.

147.    Pawnee Leasing, MMP Capital, and Amur additionally undertook steps to bind Plaintiffs in spite of Cynosure's misrepresentations regarding the SculpSure System, which Pawnee Leasing and MMP Capital, provided financing for, by causing pre-delivery agreements to be executed in or around June 2019 authorizing full payment be made to Cynosure prior to delivery of the SculpSure System—designed to preclude Plaintiffs from returning the equipment. In effect, these acts further helped to conceal Cynosure's misrepresentations regarding the machine's capabilities or characteristics.

148.    Cynosure, Pawnee Leasing, and MMP Capital, pursuant to this arrangement, would not accept return of the Cynosure equipment.

149.    Cynosure, Pawnee Leasing, MMP Capital, and Amur further possessed a peculiar power of coercion in that each of them, with combination of the other, provided a calculated means for customers, like Plaintiffs, to purchase and finance various equipment (*i.e.* the SculpSure System and TempSure System) before such individuals would have an adequate opportunity to inspect the equipment or otherwise disprove the misrepresentations made by Cynosure.

150.    Cynosure, Pawnee Leasing, MMP Capital, and Amur achieve this by acting in concert with one another to structure leasing and/or finance agreements to purportedly be "non-cancellable" prior to delivery of the equipment, for which some of the companies solicit pre-installation agreements binding parties to finance such equipment prior to delivery of it.  All of these transactions are also executed and finalized, prior to any opportunity to learn more about

the equipment from a live demonstration or promotional event by Cynosure—despite Cynosure's representations that such transactions are cancellable after attending such demonstrations if the machine(s) do not meet with expectations.

151.    As a result of MMP Capital, Amur, Pawnee Leasing, and Cynosure's combination, they possess a power of coercion to further solicit and consummate the sale of various machine(s) irrespective of Cynosure's misrepresentations about those machines.

152.    As a result of Pawnee Leasing, MMP Capital, Amur, and Cynosure's conspiracy and related acts, Plaintiffs were damaged through the purchase and financing of equipment that does not meet with the misrepresentations relied on and made to Plaintiffs.

WHEREFORE, Plaintiffs demand entry of a judgment for all damages, prejudgment and post-judgment interest, attorneys' fees, costs, and all other relief this Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

St. Francis Holdings, LLC and Francis J. Averill, M.D. hereby demand a trial by jury of all issues so triable.

Dated:  June 12, 2020

**SHUMAKER, LOOP & KENDRICK, LLP**

By: */s/  C. Philip Campbell, Jfr.*
C. PHILIP CAMPBELL, JR., ESQ.  (FBN: 160973)
JEFFREY B. FABIAN, ESQ. (FBN: 85868)
MATTHEW A. CERIALE, ESQ. (FBN: 1020226)
101 East Kennedy Boulevard – Suite 2800
Tampa, FL  33602-5126
Telephone:  (813) 229-7600
Facsimile:  (813) 229-1660
Primary email:  pcampbell@shumaker.com
Secondary email: psantivasci@shumaker.com
Primary email:  jfabian@shumaker.com
Secondary email: ldyer@shumaker.com
Primary email: mceriale@shumaker.com
Secondary email: dmccabe@shumaker.com
*Counsel for Plaintiff*

# EXHIBIT 1



Home      Results

# Find a Provider

Ready to find your beautiful? Get started by locating a Cynosure provider near you.

COUNTRY *
United States                                                                                     ▼

POSTAL CODE *
33602

DISTANCE
25                                                                                                ▼

TREATMENT (0 SELECTED)
Any                                                                                               ▼

SEARCH

## Found 89 Practitioners Near You

All products                                                                                      ▼

MINIMIZE MAP











Belleair Medi-Spa

Tampa, FL 33602

WITHIN 1 MILE

MORE DETAILS



Indigo Dermatology

Tampa , FL 33602



MORE DETAILS



## Tampa Bay Plastic Surgery, Inc

Tampa, FL 33606

WITHIN 1.22 MILES

MORE DETAILS



## SpaTampa

Tampa, FL 33607

WITHIN 1.55 MILES

MORE DETAILS





## The Grand Beauty Spa

Tampa, FL 33609

WITHIN 1.80 MILES

MORE DETAILS



## South Tampa Dermatology

Tampa, FL 33609

WITHIN 1.87 MILES

MORE DETAILS

1    2    3    4    ...    15



5 Carlisle Road
Westford, MA 01886

**For Providers**

Products

Webcasts & Events

Partnership Information

**For Patients**

Treatments

Find a Provider

**About Us**

Leadership

Board of Directors

**Contact Us**

Terms and Conditions

Privacy Policy

California Supply Chain Act

Site Map

  

English (USA)   ▾

# EXHIBIT 2

    

🔍 Search

**Service you can count on. -** Get fast 75 Mbps Internet & add Phone for $25 m



🔒 **Message**

  Cynosur

  Michael G. Fost

# Kris Huston · ▬

We are meant to have amazing lives!

Tampa, Florida, United S▬ · 477 connections · **Contact info**

## About

I have had the honor of working at Cynosure for over the last 12 years, and have achieved Presidents Club 12 consecutive years. After starting in Seattle as a rep and achieving 3M in sales, I was moved to Nor Cal where I sh all records achieving 12 Million in sales. After one year in Nor Cal I was moved to LA, where I was promo    ... ▬

## Experience


**▬f Sales Gr▬**
Cynosure, Inc.
Jul 2007 – Present · ▬
Tampa, Florida, United S▬

Presidents Club- 2007-2019
Presidents Club 2018- Named Cynosure's: Director of the Y▬
Hold all company's sales records
#1 out of (25-115) Reps at the company from 2010-2017
Grew from 1.5 Million in 2007 to 41M in 2016
Promoted from Sales Rep to District Sales Manager


Messaging 11



Feb 2005 – Jun 2007 · 2 yrs 5 mos
Greater Seattle Area

Pharmaceutical R▊
▊ook my territory from #244 to #2 year one
President Clubs 2005- #2/244
Presidents Club 2006- #7/244

### Account Ex▊▊▊

Sep 2003 – Jan 2005 · 1 yr ▊ ▊▊
Greater Seattle Area

Sold Audio, Web and Video Conferencing
Sold to V and C Level Mid to Large Companies in th▊

### Sales Recruit▊▊

Aug 2002 – Aug 2003 · ▊▊▊▊
Greater Seattle Area

I worked for an elite sales recruiting firm, and realize▊

## Education



▊▊▊▊▊▊ashington - **Michael G. Foste**▊
Bachelor's degree, Business Administration and Ma▊
▊▊▊ ▊▊



**▊▊▊ ▊ ▊ver College**
Associate's degree, Business Administration and Management, General, ▊▊
▊▊▊ ▊▊

## Skills & Endorsements

**Inspiring Leadership** · 15

 Endorsed by **10 of Kris' colleagues at Cynosure, LLC.**

**Business Transformation** · 11



# EXHIBIT 3

**Cesar Fernandez**

**To:**            Rose Averill
**Subject:**       RE: Welcome Aboard with Cynosure

Good morning.

Welcome Aboard with Cynosure!  We are excited to partner with you and your practice.

My name is Heather McLeod and I am the Account Manager working directly with Kris Huston and the team here in North Florida.  I am reaching out to welcome you and let you know that Brittney Walton will be your Customer Success Manager.  I have cc'd her here and provided her contact information at the bottom of this communication so that you have her information on hand.

Over the next few weeks, Brittney will help you handle everything to make your purchase as seamless as possible and she will be your first point of contact moving forward. The goal is to get your devices up and running as quickly as possible and to work directly with you on the following

- work with our team to keep you updated on delivery, installation and clinical training dates.

- contact you directly to schedule an" in-service" to educate you and your staff on your new product, what expected results will be and review frequently asked questions and how to answer them.

- introduce you to the tools available to you, to best market your new product. Cynosure is focused on your success, and our goal is to provide easy online access to the tools that will best market your aesthetic laser.

- help you set up your account profile on the NEW and improved Cynosure Amplified Marketing Practice Support (AMPS) Portal and introduce you to your dedicated AMPS Support Manager who will provide you marketing guidance and recommendations for launching your new product.

**What to expect:**
Once Your order has been submitted, your product will be shipping shortly via DHL.

**Delivery:** DHL will call you to arrange a delivery date and give you a window of time that they will arrive at your office. Someone needs to be present to sign upon delivery.

**Install Team:** Once you have a delivery date, please call our INSTALL Dept. to arrange a date to have your laser setup.  Please have the correct electrical outlet for your product before scheduling. Our Install Dept. can be contacted @ 888-523-2233.

**In Office Clinical Training** – One of our Clinical Trainers will contact you to schedule a date to train you and your staff members.
If you have any questions, please feel free to call me anytime.

We are available to help with anything you may need or handle any issues that arise.  Have a wonderful day!

CONTACT INFORMATION:
Brittney A. Walton
CSM- North Florida, South Florida, Puerto Rico, Bahamas

Cynosure ~ A Hologic company
985-634-6462
Brittney.walton@hologic.com

Warmest Regards,

**Heather McLeod**
Account Manager-North Florida

CYNOSURE
A Hologic Company

M: 407.784.4124
F:  813.315.6010
E: heather.mcleod@hologic.com

**Cesar Fernandez**

| | |
|---|---|
| **From:** | Rose Averill |
| **Sent:** | Thursday, June 27, 2019 11:14 AM |
| **To:** | Cesar Fernandez; Cassy Moreau; Christina Bodenheim |
| **Subject:** | Fwd: FYI: Sales Order, 4984037 has been Booked |
| **Attachments:** | Notification Detail.html |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: HOLPRD Workflow Mailer <wf_holprd@hologic.com>
Date: 6/27/19 10:25 AM (GMT-05:00)
To: Rose Averill <raverill@stfrancismed.com>
Subject: FYI: Sales Order, 4984037 has been Booked

**Time Zone (GMT -05:00/-04:00) Eastern Time**

To **Rose Averill**
Sent **27-JUN-19 10:25:02**
ID **27727901**

CYNOSURE
**A Hologic Company**
**Sales Order Acknowledgment for Order Number 4984037**

**Ship Method: DHL-Global Forwarder**
**Freight Terms: INCLUDED**

Thank you for placing your order with Hologic Inc. Please ensure the following details are accurate and complete.

| Line | Ship To | Po Number | Item | Item Description |
|---|---|---|---|---|
| 1.1 | 802 N BELCHER RD | 201906.9667 | 675-7026-005 | SCULPSURE® NON-INVASIVE BODY CONTOURING PLATFORM |
| 1.1 | 802 N BELCHER RD | 201906.9667 | 105-7026-000 | SculpSure® Non-Invasive Body Contouring Platform |
| 1.1 | 802 N BELCHER RD | 201906.9667 | 921-7026-000 | SculpSure® Marketing Package |
| 1.1 | 802 N BELCHER RD | 201906.9667 | 106-7026-002 | Pager System |
| 2.1 | 802 N BELCHER RD | 201906.9667 | 100-7026-004 | Patented Applicator for Contouring (PAC)Treatments |
| 3.1 | 802 N BELCHER RD | 201906.9667 | 1620-0163 | LOTION BOTTLE |

For Questions or Further Assistance Please Contact Hologic:
Cynosure
A Hologic Company
5 Carlisle Rd
Westford MA USA 01886
Phone: 800-886-2966 Fax: 978-223-8634

1

**Cassy Moreau**

| | |
|---|---|
| **From:** | Rose Averill |
| **Sent:** | Friday, June 28, 2019 10:32 AM |
| **To:** | Cesar Fernandez; Cassy Moreau |
| **Subject:** | FW: Sales Order, 4986203 has been Booked |
| **Attachments:** | Notification Detail.html |

**From:** HOLPRD Workflow Mailer <wf_holprd@hologic.com>
**Sent:** Friday, June 28, 2019 10:25 AM
**To:** Rose Averill <raverill@stfrancismed.com>
**Subject:** FYI: Sales Order, 4986203 has been Booked

Time Zone (GMT -05:00/-04:00) Eastern Time

| To | **Rose Averill** |
|---|---|
| Sent | **28-JUN-19 10:23:36** |
| ID | **27731519** |

CYNOSURE A Hologic Company

**Sales Order Acknowledgment for Order Number 4986203**

**Ship Method: DHL-Global Forwarder**
**Freight Terms: INCLUDED**

Thank you for placing your order with Hologic Inc. Please ensure the following details are accurate and complete.

| Line | Ship To | Po Number | Item | Item Description | Q... Qu |
|---|---|---|---|---|---|
| 1.1 | 802 N BELCHER RD | 201906.9667 | 675-7026-005 | SCULPSURE® NON-INVASIVE BODY CONTOURING PLATFORM | EA |
| 1.1 | 802 N BELCHER RD | 201906.9667 | 105-7026-000 | SculpSure® Non-Invasive Body Contouring Platform | EA |
| 1.1 | 802 N BELCHER RD | 201906.9667 | 921-7026-000 | SculpSure® Marketing Package | EA |
| 1.1 | 802 N BELCHER RD | 201906.9667 | 106-7026-002 | Pager System | EA |
| 2.1 | 802 N BELCHER RD | 201906.9667 | 675-7026-005 | SCULPSURE® NON-INVASIVE BODY CONTOURING PLATFORM | EA |

For Questions or Further Assistance Please Contact Hologic:
Cynosure
A Hologic Company
5 Carlisle Rd
Westford MA USA 01886
Phone: 800-886-2966 Fax: 978-223-8634

Thank you

1

# EXHIBIT 4

Cynosure, Inc.
5 Carlisle Rd
Westford, MA 01886
T: 800-886-2966
F: 978-349-7443

Terms
Prices are FCA, Westford, MA Incoterms 2000 in U.S. dollars
Payment Terms:  15% non-refundable deposit required with purchase order.
         Balance due net 30 days with prior credit approval.  (VISA/Mastercharge/American Express accepted.)
         Payment is not contingent upon installation and/or acceptance.
         1.5% interest due monthly on overdue balances.
**All Sales are final.  Cynosure Grants no right of return.**

*Due to continuing improvements, prices and specifications are subject to change without notice.*

*Cynosure reserves and the Customer grants to us, a security interest in all Products sold and all proceeds to secure the full payment.*

*Warranty Information*

**Return Goods Authorization Service**
Product, damaged or otherwise, will not be accepted by return shipments without prior approval from Cynosure's Customer Service Department.  Authorization for return is at the sole discretion of Cynosure.  All returned Product must be accompanied by a RETURN MATERIALS AUTHORIZATION number issued by Cynosure.

**SculpSure® Workstation Warranty**
Cynosure warrants to the original purchaser of the Product, including applicators, that the Product is free from defects in materials and workmanship, under normal use and service, for a period of twelve (12) months from the date of shipment ("SculpSure Product Warranty").  Product consumables and accessories such as water filters, attachment frames, belts, and headgear are warranted for a period of thirty (30) days from the date of shipment.  Replacement parts other than the items stated above that are purchased outside of this SculpSure Product Warranty are warranted for a period of thirty (30) days from the date of shipment.
**PAC Key Warranty**
The warranty period for the PAC Key for use  with the Product  shall be for the useful life of the individual key (i.e., the remaining number of PAC treatment applications), which period shall begin on the date Cynosure ships the applicable PAC Keys to Customer (the "PAC Key Warranty Period").  Cynosure warrants to Customer during the PAC Key Warranty Period that the applicable PAC Keys will be free from defects in materials and workmanship and will substantially conform to Cynosure's written specifications applicable to the PAC Keys as such specifications exist on the date of shipment.

Cynosure is an Equal Opportunity Employer.

THE OBLIGATIONS OF CYNOSURE UNDER THIS WARRANTY ARE LIMITED, IN ITS EXCLUSIVE OPTION, TO REPAIR OR REPLACE PARTS AND MATERIALS WHICH PROVE TO BE DEFECTIVE.

These Warranties are null and void a) where the Product is unpacked, installed, serviced, and/or repaired by person(s) other than an authorized Cynosure service representative; b) where service is required due to the Customer's failure to operate or maintain the Product in an manner consistent with the specifications and guidelines set forth in the Product's operator manual; and/or c) where service is required due to attempted or actual dismantling, disassembling, alteration, and/or modification of the Product by person(s) other than an authorized Cynosure service representative.

Additional services, including, but not limited to telephone support, repair, maintenance, and refurbishment of equipment, may be purchased.

THE FOREGOING WARRANTIES ARE THE SOLE AND EXCLUSIVE WARRANTY OBLIGATIONS OF CYNOSURE, AND THE REMEDY PROVIDED ABOVE IS IN LIEU OF ANY AND ALL OTHER REMEDIES.  THERE ARE NO OTHER AGREEMENTS, GUARANTEES, OR WARRANTIES, ORAL, WRITTEN, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION, WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CYNOSURE SHALL NOT BE LIABLE FOR LOST PROFITS OR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES DUE TO ANY CAUSE WHATSOEVER EVEN IF ADVISED AS TO THE POSSIBILITY OF SUCH DAMAGES. THE CUSTOMER AGREES THAT CYNOSURE'S LIABILITY IS SO LIMITED.

This Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts.  The Customer agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston, Massachusetts.

AUTHORIZED USE
Use of the Product is permitted only for individuals who are: (i) authorized to treat patients, as defined by the applicable state medical review board in the jurisdiction in which the Product is operated; or, (ii) under the supervision of such licensed physicians.
The Customer is responsible to ensure that all operators have the requisite skill required to use the Products as defined by the applicable state medical review board in the jurisdiction in which the Product is operated. Customer will, at all times, ensure that it and its employees and agents are and remain in full compliance with all federal, state, and local laws and statutes, including without limitation state medical agencies and certification boards, relating to this Agreement or the Product or their use.

The Customer acknowledges that proper operation of the Product requires use of supplies specifically engineered to meet Cynosure's compatibility, quality and performance standards.  Accordingly, the Customer Agrees to use only supplies provided by or expressly authorized by Cynosure and never to buy supplies from any other supplier for use with the Product.  Customer use of supplies not provided or expressly authorized by Cynosure will void all warranties and extended warranties on the Product.
All future PAC Key purchased by Customer must be used in the purchased Product or other SculpSure laser systems purchased by Customer and may not be transferred to a third party for use in another SculpSure laser system.

Upon completion of training, Customer shall become an authorized provider of Cynosure products and authorized in connection therewith to use the Cynosure trademarks solely in its promotion and delivery of services utilizing Cynosure products, and in accordance with any guidelines provided by Cynosure. However, Cynosure strictly prohibits Customers from purchase and/or use of internet domain(s) consisting of or incorporating any of the Cynosure trademarks. Customer agrees not to purchase and/or use internet domain(s) consisting of or incorporating any of the Customer trademarks. Customer acknowledges Cynosure's exclusive ownership of the Cynosure trademarks and that its use thereof inures solely to Cynosure's benefit. Customer shall not attempt to obtain registration of any Cynosure trademark, and shall not debrand, rebrand or private label any Cynosure product or service.
TERMINATION OF USE

Customer acknowledges that its use of the Product (including the Software) is subject to compliance with the usage and other requirements described in this Agreement (including, without limitation, the "Authorized Use" provisions above). Customer's authorization to operate the Product and license to the software will terminate automatically in the event Customer fails to comply with such requirements. In such event, in addition to any other remedies available to Cynosure under applicable law, Customer expressly agrees that Cynosure will have the right to cease selling Products to the Customer, including but not limited to SculpSure Drives, supplies and consumables.
DATA COLLECTION
Cynosure reserves the right to collect system usage data from time to time for the purpose of running diagnostics and improving usability and performance of the Product. Data collected will not contain any patient identification information.

*[handwritten at top]* Caverill@St francis med.com

**Customer Purchase Agreement**

5 Carlisle Rd, Westford, MA 01886
Telephone: 978-256-4200    Fax: 978-349-7443

Date:

## CUSTOMER INFORMATION

| Customer Name: | | Ultimate Ship To: | |
| Contact Person: | | | |
| Address: | | | |
| City/State/Zip: | | | |
| Telephone/Fax: | | Telephone/Fax: | |

## PRODUCT DESCRIPTION

| PRODUCT DESCRIPTION | QTY | Unit Price (in USD) | Total Price (in USD) |
|---|---|---|---|
| **SCULPSURE® NON-INVASIVE BODY CONTOURING PLATFORM**<br>1060nm wavelength, 240W maximum power.  Complete with on-site installation & 2 day clinical in-service, and one (1) year equipment warranty.  System includes:<br>• 4 ea Laser Diode Applicators<br>• 1 Body wearables kit with attachment frames & belts<br>• Photo Positioning Mat and Backdrop<br>• 2 Bottles Lux Lotion<br>• 1 Patented Applicator for Contouring (PAC) key with 50 body PACs for clinical training<br>• Two Component Pager System (transmitter & pager) for non-emergency patient communication to the treatment staff<br>Freight | 1 | $220,750 | $220,750 |

*[handwritten]* PPP=Included
2 Years Extend Pog Included
5k Marketing Rebate

**Marketing Package:**  Printed and electronic marketing material support including: product brochures, print-ready files, web and media files, before and after photos.

*[handwritten]* 205,750

\* Commencing 120 calendar days from the SculpSure clinical in-service date, a minimum purchase of 2 PAC Key per 90 days thereafter will need to be maintained along with compliance with Cynosure's Minimum Advertised Pricing (MAP) Policy in order to qualify for the discounted pricing ($3500 for body PAC Keys & $3750 for submental PAC KEYs).

**Quoted Price Valid for 30 days from above date.  Prices do not include sales, duty or excise taxes, including medical device excise taxes which are the responsibility of the Customer to pay and will be billed separately.**

| | $ 205,750.00 |

## ACCEPTANCE OF AGREEMENT

By signing below, the Customer (i) is representing to Cynosure, Inc. ("Cynosure") that it has the requisite corporate authority to execute and deliver this Customer Purchase Agreement ("Agreement") and has the required licensing from the applicable state medical review board to operate the Product purchased by this Agreement, and  (ii) is entering into a binding agreement for the purchase of the Product and/or services described above and accepts all of the terms and conditions as stated in this document (including the following page(s), and (iii) hereby acknowledges receipt and understands the content of the Cynosure Minimum Advertised Price Policy.  This Agreement is subject to Cynosure's terms and conditions of sale contained or referred to herein and the Customer expressly disclaims any additional and/or different terms and conditions or any terms and conditions on the Customer's purchase order.  Federal law restricts the sale of the products to a licensed practitioner.

*[handwritten signature]*  6/26/19

*Customer Signature (Authorized Representative)*      / Date

*Cynosure Area Sales Manager Signature*      Date

**Delivery Date:** [        ]

934-SM03-004, Rev. E

*[handwritten at bottom]* 352-812-2208
murphy  352-806-1073

CYNOSURE

5 Carlisle Road, Westford, MA 01886
Telephone: 978-256-4200    Fax: 978-349-7443

**Customer Purchase Agreement**                                          Date:

| CUSTOMER INFORMATION | |
|---|---|
| Customer Name: | Ultimate Ship To: |
| Contact Person: | |
| Address: | |
| City/State/Zip: | Telephone/Fax: |
| Telephone/Fax: | |

| PRODUCT DESCRIPTION | QTY | Unit Price (in USD) | Total Price (in USD) |
|---|---|---|---|
| I. TempSure® RF Generator with:<br>A. TempSure Envi face & body application that includes:<br>• On-site installation & clinical in-service, and one (1) year equipment warranty<br>• Footswitch and power cord<br>• Cart<br>• 5 Treatment Handpieces (10mm, 15mm, 20mm, 25mm, 30mm) - 25hr life each handpiece<br>• 2 Massage Heads and Handpiece Adapter<br>• 1 box (6 containers) treatment gel (8 oz/container)<br>• 4 boxes disposable neutral pads (25 pads/box)<br><br>• 1 Cosmetic Treatment Package (50 Micro-insulated Needles, 1 Surgical Handpiece, 50 Surgical Brochures)<br>• TempSure Envi Practice Marketing Kit :  Printed marketing material support including: patient pamphlets, AMPS post-sale marketing support materials, treatment pads.<br>• Freight<br><br>B. TempSure® Vitalia small area treatment application includes:<br>• 1 TempSureVitalia Smart Handpiece (100 uses)<br>• 1 box Vitalia disposable 18mm probes (5/box)<br>• 1 (8 oz) container treatment gel<br>• 1 box disposable plastic sleeves (25/box)<br>• 1 Box of Neutral Pads (25/box)<br>• 1 single-use Vitalia enable USB key<br>• TempSure Vitalia Practice Marketing Kit :  Printed marketing material support including: patient pamphlets, AMPS post-sale marketing support materials. | 1 | $180,750 | $180,750 |
| | 1 | | |
| *10K Marketing* | | | |
| | | *140,750* | |
| Quoted Price Valid for 30 days from above date.  Prices do not include sales, duty or excise taxes, including medical device taxes which are the responsibility of the Customer to pay and will be billed separately. | | | $180,750 |

| ACCEPTANCE OF AGREEMENT |
|---|
| By signing below, the Customer (i) is representing to Cynosure, Inc. ("Cynosure") that it has the requisite corporate authority to execute and deliver this Customer Purchase Agreement ("Agreement") and has the required licensing from the applicable state medical review board to operate the Product purchased by this Agreement, and  (ii) is entering into a binding agreement for the purchase of the Product and/or services described above and accepts all of the terms and conditions as stated in this document (including the following page(s)).  This Agreement is subject to Cynosure's terms and conditions of sale contained or referred to herein and the Customer expressly disclaims any additional and/or different terms and conditions or any terms and conditions on the Customer's purchase order.  Federal law restricts the sale of the products to a licensed practitioner. |

_____  6-25-19          _____
Customer Signature (Authorized Representative)   Date          Cynosure Area Sales Manager Signature          Date

Delivery Date: [          ]                                          934-SM03-004, Rev. E

# EXHIBIT 5

800.864.4266



About    Brokers    Broker Portal    Customer Portal    Contact    Home

## Our goal is to provide the kind of service we want to receive ourselves.



### To us this means timely responses with a 'can do' attitude.

Professional in our approach, enjoyable to work with, and creative in our solutions helping you with equipment financing through equipment leasing. We always have a number of solutions to tricky problems and strive to have your contact with us be an enjoyable experience.

Pawnee Leasing Corporation is a **small-ticket equipment leasing company** specializing in providing **business equipment Leases for equipment financing from $1,000 – $250,000 for all credit types**. Founded in 1982, we originate all of our leases through an independent network of lease brokers and conduct business in all of the lower 50 states of the U.S. We are active members and leaders in several industry trade associations including the American Association of Commercial Finance Brokers (AACFB), National Equipment Finance Association (NEFA), and the Equipment Leasing and Finance Association (ELFA).

Whether you are an independent Equipment Leasing Broker, Equipment Dealer/Manufacturer or a Small Business Owner with unique credit needs, we believe our creativity and superior service provide our customers important opportunities not offered by most traditional leasing companies.



#### Equipment Leasing Broker:

Many in the industry describe our firm as the "Premier funding source for start up and less traditional credit applicants". Our services can provide an important component to a full service lease brokerage by helping the broker differentiate themselves from their competition by having a funding source available for every



#### Equipment Dealer/Manufacturer:

Create new sales opportunities and add to your bottom line.
If you actively use leasing as a sales tool with your prospects you're most likely working with a lease company that simply doesn't consider leasing applicants whose business is under two (2) years time in business (start-up) or has a credit profile



#### Small Business Owner:

Seeking financing for equipment for your business? Are you a new business or one that has unique credit needs? We're here to help. We finance most equipment types ranging from $1,000 up to $250,000, with terms up to six years. If you have already selected an equipment dealer/manufacturer please have them contact us or for

credit worthy leasing applicant including start-ups and those with past credit problems. Our programs are easy to understand, our credit process is hands-on and our funding is simple and quick — all intended to assist a lease broker in capturing new vendor and customer relationships. Please see the Broker area for extensive information about our programs, audio and video training and on-line documentation.

that doesn't meet their more rigid credit parameters. Those are lost sales opportunities for you! We can help you increase your sales! We're happy to refer you to an approved Pawnee Leasing broker, whom can educate your sales force about the benefits of leasing as well as helping them match our credit guidelines with many of your sales prospects. Please see the "Equipment Vendor" button on our home page to contact us.

quickest assistance, select the "Business Owner" button on our home page and we will have an equipment leasing professional from our nationwide, independent network of leasing brokers contact you right away to help you acquire the equipment you need to grow your business. Equipment leasing is a cost effective, quick, easy and smart way to acquire capital equipment for your business and is the reason why more than 80% of businesses today choose equipment leasing.

# Message from Gary Souverein, President

Welcome to our Web Home. Even though many of you who will visit our website routinely know our business very well, we still have the goal of creating a website that would be more than a postcard of Pawnee Leasing Corporation. Rather we want it to be fresh and useful. What you will find beyond the home page will be a wealth of information and resources created to support and serve our equipment finance brokers & lessors.

Broker partners may also access our online AppTrak system – the backbone of our operating systems where you can submit applications and experience cradle to grave communications on your transactions, all on-line 24/7.

—*AppTrak* also provides you:

- — Customizable access and password protected areas unique to your individual staff's roles and responsibilities in your business.
- — Auto population of all lease/loan documentation for quick and easy generation
- — Custom branding of generic documents
- — Choice to automatically generate Edocs for electronic signatures and same-day funding
- — Retrieval of all application and lease/loan documents for easy reference or reproduction
- — Customized reporting on your application activity
- — Current reporting on your customer's performance
- — Detailed reporting on leveraging end-of-lease activity
- — Customer Portal
- — View their contracts
- — Make payments
- — Upload Insurance
- — See their contract details
- — View or receive their payment history
- — Request payoff
- — Change their ACH
- — Change their Bank information
- — And much more…



One hint, I highly recommend exploring the video and audio training features available on the website. Even the most seasoned leasing salesperson can benefit from our "On-Line Training Center". Presentations encompass the 101's of lease marketing that we all need to be reminded of from time-to-time, teachings on addressing common objections in small-ticket leasing such as personal guaranty's, dealing with objections such as ACH, selling our unique "term residual lease" product and more. Many of our brokers use these valuable features in regular training with their new and tenured salespeople.

For those of you who have not known us as perhaps the most tenured funding source serving the brokerage community, I'll offer you some insight about our company. Established in 1982, Pawnee was founded as a niche, national firm that specialized in providing small-ticket lease products to start-up companies and other firm's that were well established but had some credit difficulty in their past such that they could not qualify with traditional lenders. Today, our approximately 85 employee Pawnee "Tribe", underwrites the full spectrum of

Case 1:20-cv-11747-WGY   Document 21   Filed 09/12/20   Page 52 of 107

ticket credit from highly competitive "A" credit up to less traditional, credit worthy profiles. Our range of credit offerings ranges from $1,000 to $250,000 and we purchase leases in all of the lower 50 states. All of our broker relationships consider our services extremely valuable in helping them to differentiate their firms from the traditional equipment finance sources with their vendor relationships and lessee/borrower customers. We are perhaps the only funding source that dedicates 100% of their resources to the broker community only.

In 2006, Pawnee Leasing was purchased by Chesswood Group Limited, a publicly-held (TSX:CHW), specialty finance company based in Toronto, Canada and we operate as its largest subsidiary company. You can be confident in your business with Pawnee Leasing as our business experience and financial strength is unmatched in the independent lessor community.

We look forward to the opportunity to earn your business.

Gary

# Mission Statement

**To be a trusted and reliable leader in finance for American businesses by providing superior customer service, a rewarding work environment, while providing growth in value and strong returns to our shareholders.**

*In pursuit of this Mission, Pawnee Leasing Corporation shall adhere to its Core Values of:*

**Integrity** – We understand that integrity is the foundation of our brand and reputation. We demonstrate this through honesty and accountability in everything we do and expect the same from our business partners and customers.

**Teamwork** – We effectively collaborate and openly communicate. We foster and build trust by honoring our commitments while we work selflessly towards our Mission.

**Culture** – We create a culture that encourages excellence and rewards change, always seeking innovative and better ways of doing business.

**Balance** – We support well-rounded employees who combine their chosen vocation with their family and personal lives. We strive to enrich and contribute to our employees' lives and members of our local community.

---

Loans will be arranged or made pursuant to the Department of Business Oversight California Financing Law License.

Pawnee Leasing Corporation

**Contact Information:**
☎ 800.864.4266
☎ Fax 970.482.2666
3801 Automation Way
Suite 207
Fort Collins, Colorado 80525

Latest News

Chesswood Announces Change in Dividend and Provides Update on COVID-19 Activities **April 29, 2020**

Chesswood Announces Results for 2019 **April 29, 2020**

Tags

Chesswood Group Limited

Equipment Leasing Broker

Equipment Leasing Experts

Financial Services

Pawnee Leasing



---

Copyright © 2018 Pawnee Leasing Corporation | Your A, B, C & Start-Up Credit Funding Source Since 1982

6/1/2020      Equipment Leasing Broker? Get your customers bought leasing

Case 1:20-cv-11747-WGY   Document 21   Filed 06/18/20   Page 53 of 107

800.864.4266



About    Brokers    Broker Portal    Customer Portal    Contact    Home

Equipment Leasing Broker? Pawnee Leasing offers the widest array of small-ticket credit programs available to equipment leasing brokers. Our risk-based pricing includes unique programs for Start-Ups, 'A', 'B', and 'C' credits. Since 1982, we remain one of the only funding sources that exclusively serves the broker community.

## Our Programs include:

### 'A' CREDIT

- Application only
- Under 5 years time in business up to $50,000
- 5+ years time in business up to $250,000
- $5,000 to $250,000

### 'B' CREDIT

- Application only
- Under 5 years time in business considered up to $50,000
- 5+ years time in business considered up to $75,000

### 'C' CREDIT

- Application only
- No time in business requirement
- $1,000 to $35,000

### 'START-UP'

- Application only
- Under 2 years time in business
- $1,000 to $50,000
- Food/Beverage service industry considered up to $15,000
- Tanning industry considered up to $25,000



Contact your Business Development Representatives today for more information.



Jamie Nanfito
jamie@pawneeleasing.com
📞 800.864.4266 Ext. 267



Paul Phillips
paul@pawneeleasing.com
📞 800.864.4266 Ext. 280

## Sample Lease Proposal

An equipment leasing broker who use a lease proposal and presell the transaction up front consistently have a much higher closing ratio with us. In the Start-Up/"B" markets it is essential to show the lessee what the probable terms may be if the lease is approved. Many times the lessee has a pre-conceived notion of payment and terms due to a vendor quoting them without pre-qualification. If this is not cleared up in the beginning the deal is unlikely to close.



DOWNLOAD

## Broker Application

Pawnee Leasing has been exclusively serving the broker community since 1982. Please fill out the following information so we may contact you or send you our Broker Package.

**Name** *

First

Last

**Email** *

**Company**

**Address**

Street Address

City

State

ZIP Code

**Phone** *

**Fax**

**Comments**

Equipment Leasing Broker - Get your customers the right leasing...

SUBMIT

## Online Training!

Be sure to check out our online training center, learn from the pros!

TRAINING

Pawnee Leasing Corporation

Contact Information:
 800.864.4266
 Fax 970.482.2666
3801 Automation Way
Suite 207
Fort Collins, Colorado 80525

Latest News

Chesswood Announces Change in Dividend and Provides Update on COVID-19 Activities April 29, 2020

Chesswood Announces Results for 2019 April 29, 2020

Tags

Chesswood Group Limited

Equipment Leasing Broker

Equipment Leasing Experts

Financial Services

Pawnee Leasing



Copyright © 2018 Pawnee Leasing Corporation | Your A, B, C & Start-Up Credit Funding Source Since 1982

# EXHIBIT 6

NOTICE: This Lease is a non-cancelable legal commitment. You will be required to pay taxes, fees, and other charges in addition to Rent. Some charges are in amounts greater than our actual costs, risks, or exposure.

## LEASE AGREEMENT

**PAWNEE LEASING CORPORATION 3801 Automation Way Suite 207 Fort Collins, CO 80525 (Lessor)**

**Customer (Lessee): Complete Legal Name, if a corporation, LLC, or legal entity, use exact registered legal name.**

Company Name: ST. FRANCIS HOLDINGS, L.L.C.                            Contract#:

| Billing Address: | Vendor of Equipment: |
|---|---|
| 802 N BELCHER RD | |
| CLEARWATER, FL  33765 | See Attached Schedule "A" |
| County:     Phone: 727-447-3000 | |

**EQUIPMENT DESCRIPTION (Include Quantity, Make, Model, and Serial Numbers):  See Attached Schedule "A"**

Equipment Location:     802 N BELCHER RD
                        CLEARWATER  FL 33765         Equipment Cost:              $205,750.00

## SCHEDULE OF RENTAL PAYMENTS

| Monthly Rent: | See Schedule B | | |
|---|---|---|---|
| Term of Lease (in months): | See Schedule B | Rent with Tax     (Tax Rate 7.000%): | See Schedule B |
| Total Number of Rental Payments: | See Schedule B | Advance Payment (# Advance Payments 0): | $0.00 |
| | | Total Initial Payment (Advance Payment + | |
| Administration Fee: | $350.00 | Adm Fee): | $350.00 |

(Lessee authorizes Lessor to adjust rental payments by no more than 10% to reflect actual final costs, including additional sales tax, delivery and installation charges, and cost increases due to alterations requested by the Lessee.)

**DO NOT SIGN THIS LEASE UNLESS YOU UNDERSTAND AND AGREE TO ALL OF ITS TERMS (INCLUDING PAGES 2-3).**

Lessee: ST. FRANCIS HOLDINGS, L.L.C.                Accepted by Lessor: Pawnee Leasing Corporation

| Signature | Member | 26-Jun-2019 | *Wayne M. Woolley* | COO | 7/11/20109 |
|---|---|---|---|---|---|
| Francis Averill | Title | Date | Signature | Title | Date |

## GUARANTY

For the purpose of this Guaranty "you" means the undersigned Guarantors. You have an interest in the Lessee named above ("Lessee"), and we, the Lessor, would not enter into this Lease (the "Lease") without this Guaranty. You jointly and severally unconditionally guaranty the full and prompt payment and performance of all Lessee's obligations under the Lease even if we change or renew the Lease, or if any payments made by Lessee are rescinded or voided due to the insolvency, bankruptcy or reorganization, as if the payment had not been made. We do not have to notify you if the Lessee is in default under the Lease. If Lessee defaults, you will immediately pay in accordance with the default provisions of the Lease all obligations due thereunder.  You agree that you will not be released or discharged if we: (i) fail to perfect a security interest in the Equipment or any other property that secures the obligations of Lessee or any of you ("Collateral"); (ii) fail to protect the Collateral; or (iii) abandon or release any Collateral.  You agree that we do not have to proceed first against Lessee, any Collateral or any other guarantor.  You waive notice of acceptance of this Guaranty and of all other notices or demands and suretyship defenses of any kind.  You will reimburse us for all expenses we incur in enforcing our rights against Lessee or any of you, including without limitation, attorneys' fees and costs.  You authorize us to obtain credit bureau reports for credit and collection purposes and to report your performance to any credit bureau or similar entity. This is an irrevocable, continuing Guaranty and binds your heirs, administrators and representatives.  YOU AGREE THAT THE AGREEMENTS REGARDING JURISDICTION, VENUE, SERVICE OF PROCESS, AND INTENT TO TRANSACT ELECTRONICALLY CONTAINED IN THE LEASE APPLY TO THIS GUARANTY. YOU WAIVE, INSOFAR AS PERMITTED BY LAW, TRIAL BY JURY.

**DO NOT SIGN THIS GUARANTY UNLESS YOU UNDERSTAND AND AGREE TO ALL OF ITS TERMS AND THE TERMS OF THE LEASE (INCLUDING PAGES 2-3).**

Guarantor: Francis Averill                                    Guarantor:

| Signature | 26-Jun-2019 | Signature | Date |
|---|---|---|---|
| Social Security: ###-##-6305     Phone: 727-447-3000 | | Social Security:     Phone: | |
| Home Address: 2140 LONG BOW LN  CLEARWATER, FL  33764 | | Home Address: | |

## TERMS AND CONDITIONS

**1.  Lease:**  WE (the Lessor) lease to YOU (the Lessee) the Equipment described above or in any schedule hereto (hereinafter called "Equipment") for the number of months (the "Term") and the rental payments (the "Rent") shown on page 1 and on the terms and conditions stated herein and on page 3, Schedule "A", and any and all Addenda. The Term begins when you accept the Equipment or when we determine that you have begun using the Equipment (either is called the "Acceptance Date"). You must notify us in writing immediately if you reject the Equipment when it is delivered and if so, we may cancel this Lease and require you to refund any amounts we have expended. Upon the Acceptance Date, you will be deemed to have agreed that the Equipment is satisfactory and is in good working condition and this Lease will become your ABSOLUTE UNCONDITIONAL OBLIGATION THAT YOU CANNOT CANCEL OR TERMINATE, except that if you are not in default you may terminate this Lease on any Rent date by paying all amounts then due (including accrued taxes) together with all unpaid Payments for the remaining Term and the Residual Value (as defined below), each discounted to present value at 4% per annum.  One of your officers or representatives will be asked to confirm acceptance by telephone or other means. This confirmation will be binding on you and we will rely on it in paying the Vendor. Rent is due monthly on the first (1st) or fifteenth (15th), as we select, beginning on the first payment date on or after the Acceptance Date. All amounts due hereunder are payable at our office or such other place as we designate without invoice or demand.  You will pay additional Rent (interim rent) in an amount equal to 1/30th of the monthly Rent per day, from the date we buy the Equipment to the first monthly Rent payment date.  If this Lease is not finalized other than due to our wrongful action, you agree that we may, at our option, retain the Security Deposit, Advance Rent, and Administration Fee as liquidated damages.  Your Security Deposit and Advance Rent will not earn interest and, unless applied to your obligations, will be returned at the end of this Lease promptly, less any amounts you owe to us. If Advance Rent is indicated above, the Advance Rent shall be applied first to the first Rent payment due hereunder and any additional Advance Rent shall be applied to the last Rent payments due under this Agreement, in reverse order.  Any calculation involving Rent payments will be increased by taxes on the payment(s).

**2.  Disclaimers of Warranties; Limitation of Remedies:** WE MAKE NO (AND DISCLAIM ALL) WARRANTIES EITHER EXPRESS OR IMPLIED AS TO THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, ITS FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE, ITS DESIGN, ITS CAPACITY, ITS QUALITY, OR WITH RESPECT TO ANY CHARACTERISTICS OF THE EQUIPMENT. Do not accept the Equipment unless you have inspected the Equipment and it is in good condition and satisfactory to you AS IS WHERE IS and with all faults. You agree that your obligations under this Lease are ABSOLUTE AND UNCONDITIONAL and you agree to pay and perform your obligations hereunder without offset, counterclaim or defense, all of which are hereby waived to the fullest extent permitted by law. Neither the vendor of the Equipment nor any salesman is our agent or authorized to waive or alter any terms or conditions of this Lease.  No representations as to the Equipment or any other matter by the vendor or salesman effect your obligations to us.  Unless you are in default we assign to you any warranties made by the vendor or the manufacturer of the Equipment.

**3.  Use/Assignment:**  You will: use the Equipment only in the conduct of your business in a careful and proper manner and only for commercial or business purposes and not for personal, family, household, consumer, or agricultural purposes; maintain the Equipment in the same condition as when delivered, subject only to reasonable wear and tear, and replace any damaged parts; not make any alterations to the Equipment without our prior written consent. All additions, replacements, parts, or accessories immediately become our property. The Equipment cannot be moved from the location specified on page 1 without our prior written consent, except mobile Equipment can move within the continental United States if it returns regularly to the specified location. We may inspect the Equipment during normal business hours. You may not assign this Lease or lend or sublease the Equipment. We may assign our rights without notice and our assignee will not be subject to any defense or claim you have against us.

**4.  Late Payment/Other Charges:**  If you fail to pay any Rent or other amount within five (5) days of when it is due, you will pay a late payment fee equal to 15% of the delinquent Rent or other amount. You will also pay interest on any overdue amount calculated from the due date at the rate of 24% percent per annum or the maximum interest rate permitted by applicable law, whichever is lower. If payments are made by ACH or check, you will pay a $30 fee if a payment is returned unpaid. There are fees of $30 for single or $55 for a permanent change if you request a change in Rent payment dates.  If we engage an attorney or collection agency to collect any amount you will pay collection fees. On expiration or earlier termination of this Lease you will pay a termination fee of $95.00.

**5.  Loss, Damage, and Indemnification:**  You have all risk of loss of the Equipment upon shipment and for the Term, including any extension. If any Equipment is lost, stolen, destroyed, damaged beyond repair, or otherwise rendered permanently unfit for use, you will promptly pay the remaining Rent plus the "Residual Value" (which means the end of lease purchase option, if one was specified, otherwise 20% of the Equipment Cost), each discounted to present value at 4% per annum, together with any other amounts then due hereunder. You agree to defend, indemnify and hold us harmless from all liability, claims, damages, or other losses, including costs and reasonable attorneys' fees, arising out of or in any manner connected with this Lease and the Equipment.

**6.  Taxes and Fees:**  You will promptly reimburse us for and hold us harmless against all state, federal, or other fees, assessments, charges and taxes (including penalties and interest but excluding taxes on our taxable income), which now or hereafter may be imposed on or with respect to this Lease, the Equipment, or amounts payable hereunder. You authorize us to file personal property tax and other tax returns on your behalf. You will pay a tax-filing fee of $55.00 for each tax return filed with regard to the Equipment. Upon termination or expiration, or a default under this Lease, you will pay us 2% of the Equipment Cost for any assessed but unpaid taxes or other post closing costs we may incur.

**7.  Insurance:**  You will maintain current physical damage (property) insurance for the amount of Equipment Cost or replacement value, whichever is higher, naming us as a "Loss Payee" on a "Lender's Loss Payable" endorsement; and acceptable public liability insurance naming us as an "Additional Insured". Specific minimum liability amount may be required for specific types of equipment. Each policy must be with an insurer and in a form satisfactory to us.  You must provide us with written evidence of effective insurance on an ACORD 23 or equivalent document within 30 days of our request. If you do not provide evidence of required insurance to us when due, we may, but have no obligation to, obtain insurance from an insurer of our choosing in such forms and amounts as we deem reasonable to protect our interests ("Lease

Initials

Francis Averd

Insurance"). Lease Insurance covers the equipment, us and our interests only; Lease Insurance does not name you as an insured or loss payee. You agree to pay us periodic charges for Lease Insurance ("Insurance Charges"), any portion of which may generate a profit to us and/or our agents, and which include: premiums that may be higher than the premiums for required Insurance if you maintained required Insurance separately; administration fees and experience based premium refund credits that may not be shared with Lessee; and a finance charge on any premium advances made by or on our behalf, that will not exceed the maximum lawful interest rate under applicable law. After our receipt of evidence of required Insurance, your Insurance Charge payment obligation will cease. You agree to arbitrate any dispute with us or with our agents regarding Equipment Insurance or Insurance Charges under the rules of the American Arbitration Association in Larimer County, Colorado; that arbitration shall be the exclusive remedy for such disputes; and that class arbitration is not permitted. This arbitration requirement does not apply to any other provision of this Agreement.

**8. Title/UCC/Power of Attorney:** We own and have title to the Equipment. This is a "true lease" and not intended as a security agreement. In case it is determined to be a security agreement you grant to us a security interest in the Equipment and all additions, attachments, accessories and accessions thereto. You will keep the Equipment free and clear from liens and security interests of all kinds. You appoint us attorney-in-fact to file UCC financing statements; to take any other actions we deem necessary or desirable to protect our interest; and to correct information entries in this Lease.

**9. Return of Equipment:** On termination or expiration of the Term of this Lease, or upon demand following an event of default, you will, at your expense, return the Equipment to us at an address we specify in the same condition as originally received by you, except for reasonable wear and tear. Unless you (a) notify us in writing sixty (60) days prior to the scheduled expiration of the Term that you will purchase the Equipment (which such notice shall be irrevocable) and do so or (b) you promptly return the Equipment upon the expiration of the Term, the Term will continue and you will pay rent at 50% of the monthly Rent until you return the Equipment or exercise the purchase option. We do not waive any other rights under law with respect to your failure to notify us or to return the Equipment.

**10. Default:** It will be an event of default if: (a) you fail to pay Rent or any sum within five (5) days of when it is due; (b) you fail to perform any other agreement in this Lease or any other agreement with us; (c) you or any guarantor dies, becomes insolvent, merges, consolidates, or suffers a deterioration of financial health; or (d) you or any guarantor file or have filed against you or it a petition for reorganization, liquidation, or similar relief under the federal bankruptcy laws, or a trustee or receiver is appointed over your or its assets. Upon an event of default you owe us: (a) the amount of all accrued unpaid Rent and other amounts payable under this Lease; plus (b) the amount of all unpaid Rent for the remaining Term of this Lease discounted to present value from the date due at the rate of 4% per annum, plus; (c) the Residual Value discounted to present value from the anticipated end of the Lease Term as provided on Page 1, at the rate of 4% per annum. In addition, we may terminate this Lease without releasing you and you will deliver the Equipment to us as required by this Lease or we may disable, repossess and sell or lease the Equipment. You will also pay interest on any unpaid damages at the lower of 24% per year or the maximum rate permitted by applicable law. We may proceed by court action to enforce this Lease. You shall pay all costs and expenses, including legal fees, collection fees or commissions, travel, or any other cost we incur enforcing our remedies. No remedy given in this paragraph is intended to be exclusive, and each shall be cumulative. These remedies are in addition to any other permitted at law or in equity.

**11. Miscellaneous:** This is a finance lease under Article 2A of the Uniform Commercial Code as adopted by the State of Colorado (the "UCC"). Any interest or fee collected under this Lease will not exceed the highest amount permitted by applicable law and any overcharge will be refunded. We may report your performance to any national credit bureau and access business and consumer credit bureau reports for credit and collection purposes. Captions are intended for convenience or reference only and shall not alter the text. This Lease contains the entire agreement between the parties and may not be amended except in writing by one of our executive officers. Your agreements shall survive expiration or termination of this Lease. You agree to perform additional acts we request to protect our interests. Any notice to us must be in writing and must be delivered by U.S. Mail, Return Receipt Requested, or another means generating a written receipt. You authorize us to communicate with you through electronic means, including emails and/or text messages to your cellular telephone number or other wireless device, which you recognize may result in your incurring access or other fees. We are not obligated to communicate with you in this manner and you may not give any notice to us electronically. Time is of the essence of this Lease. This Lease shall be binding upon and shall inure to the benefit of each party's successors and assigns (subject to paragraph 3). The Equipment Cost stated on page 1 or the list price quoted by the vendor may not represent the actual amount financed. It is the intention of the parties that the Equipment shall remain personal property and not be a fixture even if affixed to real property. This Lease shall be governed by the laws of Colorado. You agree that legal actions may only be brought in the state or federal courts in Larimer County, Colorado, except that we may file any action where the equipment is or has been located at any time. You waive objection to venue and agree to accept service of process at your (the Lessee's) address above. You hereby waive, insofar as permitted by law, trial by jury. This Lease may be executed, communicated, and retained electronically and a facsimile or other electronic version shall be admissible. For purposes of perfecting a security interest in chattel paper by possession, only the counterpart of this Lease that bears our (lessor's) manually-applied "wet ink" signature constitutes chattel paper. The electronic counterpart of this Lease stored under our control shall be the authoritative copy under U.C.C. 9-105. To the extent this Lease is electronic chattel paper, no security interest may be created or perfected and no assignment effective except through control of such authoritative copy. You will have access to the authoritative copy for purposes of making a duplicate. Any Equipment that is subject to title registration laws may be titled and registered as directed by us. Anything herein to the contrary notwithstanding, certificates of title for the Equipment may be held by a trust designated by us and such circumstance shall not affect your obligations or rights hereunder, except that (1) all of your obligations to indemnify and provide insurance for the benefit of us shall apply equally to such trust and the party acting as trustee or servicer, and (2) as used herein, the terms "we", "us", "our", "Lessor" and similar references shall mean such trust, acting through its trustee, or servicer. Any officer/owner/partner executing this document hereby affirms that all your shareholders/owners/partners have been identified to us in writing.

**If you request in writing we will send you a copy of this Lease in larger type.**

Initials

Francis Awad

26 -Jun-2019

# Lease Schedule "A"

Contract #:

### EQUIPMENT

| Quantity | Equipment Description | Serial # | Supplier Name and Contact |
|---|---|---|---|
| 1 | 2019 Sculpsure Workstation | | Cynosure, Inc |
| | | | 5 CARLISLE RD |
| | | | WESTFORD, MA 01886 |
| | | | 978-256-4200 |

### PURCHASE OPTION

At the end of the lease term, you may purchase the Equipment if you have (1) satisfactorily complied with all terms and conditions of the Lease (2) not been in default at any time during the Lease and (3) notified us in writing at least 60 days prior to the end of the Term that you want to purchase the Equipment. You are not required to purchase the Equipment but if you purchase any of it, you must purchase all of it.

The Purchase Price will be what you and we agree is the fair market value of the Equipment at the end of the Term (which is an amount that a willing buyer, who is neither a lessee in possession nor a used equipment dealer, would pay for such equipment in an arm's-length transaction to a willing seller under no compulsion to sell assuming the equipment is in the condition in which it is required to be maintained and returned under this Lease). However, if you decide to purchase the equipment, you will pay the Purchase Price of 5 equal additional monthly payments, PLUS any applicable sales tax.

Once we receive the full Purchase Price we will give you a bill of sale providing that the Equipment is being sold to you AS IS, WHERE IS, WITH ALL FAULTS AND DEFECTS, BOTH LATENT AND PATENT, WITH NO REPRESENTATION OR WARRANTIES WHATSOEVER, EITHER EXPRESSED OR IMPLIED OF ANY KIND, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE except that we will warranty the Equipment has no liens arising by through or under us.

This purchase option supersedes any contrary terms of the Lease. Notwithstanding Section 9 of the Lease, unless you notify us in writing sixty (60) days prior to the expiration of this Lease that you will return the Equipment and you promptly do so when the Lease term ends, you will automatically exercise your option to purchase all of the Equipment as provided above.

### CERTIFICATION OF LESSEE OWNERSHIP AND AUTHORIZATION

IMPORTANT: DO NOT SIGN BELOW UNTIL THIS SECTION IS FILLED OUT. YOU (THE SIGNER, PERSONALLY AS WELL AS THE LESSEE) ARE RESPONSIBLE FOR THE CORRECTNESS OF THIS SECTION.

The person signing this agreement individually and in his/her capacity as an officer/owner of the Lessee and/or the Guarantor represents and warrants that (1) this Lease is duly executed and the equipment financed under this Lease will be used in the ordinary course of the business of the Lessee; (2) he or she has the legal right, power and authority to sign this Lease with all necessary authority from the managing member(s), directors, senior officers or other management of the Lessee and/or Guarantor and their shareholders, members, partners or other owners; (3) the following is a complete list of the owners of the Lessee and (4) this transaction is to the direct financial benefit of any Guarantor and good consideration for this guaranty:

| Name | Ownership % | Name | Ownership % |
|---|---|---|---|
| Francis Averill | 100 | | |
| | | | |
| | | | |

### AUTHORIZATION

If this Schedule "A" is executed by Lessee and thereafter sent to Lessor by facsimile transmission, then such facsimile transmission shall, upon acceptance and execution by Lessor in its offices, be admissible for all purposes as an original Schedule "A". Lessee agrees to promptly forward to Lessor this Schedule "A" with Lessee's manual signature thereon. **DO NOT SIGN THIS SCHEDULE "A" UNLESS YOU UNDERSTAND AND AGREE TO ALL OF ITS TERMS AND CONDITIONS.**

LESSEE: ST. FRANCIS HOLDINGS, L.L.C.

LESSOR: Pawnee Leasing Corporation

Authorized Signer on behalf of Lessee and Guarantor    26-Jun-2019
Francis Averill
Print Name
Member
Title                                          Date

Authorized Signer
Wayne M Woolley
Print Name
COO                                     7/11/2019
Title                                          Date

Contract #:

## Schedule B

Date: _____

Lessee:  ST. FRANCIS HOLDINGS, L.L.C.
Lessor:  Pawnee Leasing Corporation

This addendum is made part of the lease agreement dated  between Lessor and Lessee (the "Agreement"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree that the Lessee desires to make the following changes to the Agreement:

| | | | |
|---|---|---|---|
| Contact Payments (Payments 1-6) | $99.00 | Monthly Rent (Payments 7-61) | $4,357.12 |
| | | Monthly Rent with 7.00% Tax (Payments 7-61) | $4,662.12 |

## TERMS AND CONDITIONS

The Lessee hereby agrees to this change.  Except as expressly amended hereby, the Agreement and all other documents executed in connection with the Agreement are and shall be unmodified and remain in full force and effect, and nothing contained herein shall constitute or be deemed a waiver of any of the rights or obligations of the parties prior to the date hereof.  Facsimiles or other electronic transmissions of this Agreement shall be admissible as originals for purposes of evidence. This Schedule B may be executed in counterparts, and all parties need not execute the same counterpart; however, to the extent this Agreement constitutes chattel paper, the counterpart of this Schedule B containing Lessor's manually applied signature and marked "Original" shall be the sole original counterpart of the chattel paper for purposes of possession under the UCC.

This Schedule B, the Agreement and the other documents executed in connection with the Agreement represent the final agreement between the parties and may not be contradicted by evidence of any oral or prior agreement.

## AUTHORIZATION

| LESSEE: ST. FRANCIS HOLDINGS, L.L.C. | LESSOR: Pawnee Leasing Corporation |
|---|---|
| _26 Jun 2019_ | _Wayne M Woolley_ |
| Authorized Signor | Authorized Signor |
| Francis Averill | Wayne M Woolley |
| Print Name | Print Name |
| Member | COO                    7/11/2019 |
| Title                          Date | Title                          Date |

V190214



**PAWNEE**
LEASING CORPORATION

## PAYOFF QUOTATION

As of: **05/27/2020**

| | |
|---|---|
| Contract No. | 369964 |
| Customer: | ST. FRANCIS HOLDINGS, L.L.C. |
| Equipment: | SCULPSURE CONTOURING PLATFORM |

Payments Started: 08/01/2019

| | |
|---|---:|
| Remaining Balance: | 226,570.24 |
| | |
| Remaining Balance, Discounted 4% Present Value for In Default | 209,076.79 |
| Purchase Option | 21,785.60 |
| Returned Payments | 4,357.12 |
| Open Property Tax Charges ** | 0.00 |
| Estimated Final Personal Property Tax | 3,703.50 |
| | -------------------- |
| Total Contract Obligation | 238,923.01 |
| | |
| Tax on Contract Obligation | 16,724.62 |
| Other Miscellaneous Charges Due ** | 1,484.33 |
| Termination Fee | 95.00 |
| | -------------------- |
| Total Due | 257,226.96 |
| | |
| Less Security Deposit | -          0.00 |
| Overpayments | -          0.00 |
| | -------------------- |
| Net Payoff Due | 257,226.96 |

### Note: Payoff is good through 05/28/2020

### CHARGE DETAIL **

| | | | | |
|---|---:|---|---:|---|
| 04-01-20 TAX RETURN CHARGE | 1.96 | 04-01-20 RETURN CHARGE | 28.04 | |
| 04-13-20 LATE CHG [9] | 653.57 | 05-12-20 LATE CHG [10] | 653.57 | |
| 05-01-20 FINANCE CHARGE | 92.19 | 05-27-20 2020 PPT PREP FEE | 51.40 | |
| 05-27-20 TAX ON PPT PREP FEE | 3.60 | | | |

*Liens or titles will be released upon clearance of payment for all amounts due under the contract.*
*For contracts with UCC filings the secured party will promptly file a UCC-3 termination statement and copies will be provided.*

3801 Automation Way Suite 207 • Fort Collins, CO 80525 • 1-800-864-4266 • Fax 1-970-224-1105
arrow@PawneeLeasing.com • www.PawneeLeasing.com

  

# EXHIBIT 7



07/12/2019                                                            Lease No. 369964     RECEIVED
                                                                                          JUL 1 7 2019

FRANCIS AVERILL
ST. FRANCIS HOLDINGS, L.L.C.
802 N BELCHER RD
CLEARWATER, FL 33765


Dear Customer:

Pawnee Leasing Corporation is pleased to have the opportunity to provide your leased equipment.  Even though you have recently spoken to one of our representatives who confirmed several aspects of our lease agreement, we want to again highlight several important terms that will require your attention.

Your payment is $105.93, which includes any applicable taxes.  It will be automatically withdrawn from your business checking account commencing on 08/01/2019, and each month thereafter for the full term of your lease.  All of our leases are paid through this efficient method, and any unauthorized changes in these procedures could result in penalties and additional expense to your firm.  Please refer to your lease agreement for specific information relating to these potential expenses.  If you have not received a copy of your lease agreement and would like one, please contact Customer Service at 800-864-4266.

With some exceptions, municipalities or counties require the payment of personal property taxes on business equipment.  To assure that these taxes are paid on a timely basis and to avoid any penalties for late payments, we pay these taxes and bill you for the amount assessed by your taxing authority.  Our charge for this tax filing is $55.00 per year.

We also want to remind you that you are required to have insurance for the equipment during the full term of your lease.  In the event we do not have evidence of insurance, the lease provides that we may obtain insurance from an insurer of our choosing and for amounts we deem reasonable to protect our interests (see your lease for specific insurance information).  There will be periodic charges for Lease Insurance (which may include premiums and administrative fees) which you will be responsible for.  These charges will not be incurred if we receive the required proof of insurance.

Finally, enclosed (if applicable) you will find an invoice representing the interim rent due prior to automatically drafting your first scheduled lease payment.  Interim rent is the payment assessed from the date the equipment is purchased by Pawnee Leasing Corporation to the date of your first actual lease payment.  This invoice is due upon receipt.

Again, thank you for allowing Pawnee Leasing the opportunity to service your leasing needs.  If at any time you have questions, please feel free to contact us.  We wish you success in your business and look forward to a mutually beneficial association with your firm.

Sincerely,

Gary Souverein
President

3801 Automation Way Suite 207 • Fort Collins, CO  80525 • 1-800-864-4266 • Fax 1-970-224-1105
arrow@PawneeLeasing.com • www.PawneeLeasing.com

  



**PAWNEE**
LEASING CORPORATION

FRANCIS AVERILL
ST. FRANCIS HOLDINGS, L.L.C.
802 N BELCHER RD
CLEARWATER, FL 33765

Date: 07/12/2019

Contract No. 369964

## INVOICE

| Contract No. | Date | Charge Description | Amount | Taxes | Payment | Due |
|---|---|---|---|---|---|---|
| 369964 | 12/11/2019 | INTERIM RENT | $3,049.98 | $213.50 | $0.00 | $3,263.48 |

TOTAL DUE:   $3,263.48

Interim rent is provided for under Article 1 of your lease document.  It is a partial payment for the days between the date that Pawnee funded the purchase and the first regular payment.  A maximum of 30 days interim rent will be charged. Please call us at (970) 482-2556 (Ext. 2) with any questions regarding this matter.

This invoice is for the lease rental from 07/11/2019 to 08/01/2019.

**THIS INVOICE IS DUE UPON RECEIPT - THIS IS NOT ACH**

3801 Automation Way Suite 207 • Fort Collins, CO  80525 • 1-800-864-4266 • Fax 1-970-224-1105
arrow@PawneeLeasing.com • www.PawneeLeasing.com

  

# EXHIBIT 8



"We have been
working with the rock
star team at MMP
Capital for years. These
guys are fantastic. As an

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK




gets the job done, is a crucial ingredient to our success. Look no further, these guys are the best!!"

— SCOTT, PRESIDENT - IRVINE,

CA

"JP and his entire team have been the reason why I have been able to advance my practice, increase my practice revenue, and not feel

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

  

responsive and informative, but I can contact them at any point and know that I have the support I need for my business. The best part about it all is that they make it work for whatever your financial situation is at the moment. I have worked with a few financial institutions and I inevitably came back to only give them by business because they cant be surpassed in dedication, intelligence,

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

 

colleagues and friends!"

— MIRA, FREEHOLD, NJ

"I use Mike McCaffrey and MMP Capital to finance all my equipment. They are fast, reliable and get me great rates!"

— CHUCK SMITH, PRESIDENT -

BALL GROUND, GA

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

 

"My experience in working with MMP Capital has been nothing short of excellent. The customer service they provide and the trust I have in them makes all the difference compared with other equipment leasing companies. In particular, I enjoyed working with Jim Siederman, who truly seems to have my best interest at heart. Jim has always worked hard to meet my capital needs.

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

 

extra mile in finding creative programs tailored for us. Its great to have a a partner like Jim and MMP Capital. I cannot recommend MMP Capital highly enough."

— BILL RAMIREZ, VICE-

PRESIDENT - DALLAS, TX

"Working with MMP Capital in one word would be: Easy. These

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK



deal done. Customer service is on point, and they work hard to get the client approved, regardless of their credit history. With all of the responsibilities us Sale Reps have on the floor as is, it is nice to work with a financial partner that can help take some of that work load away. I highly recommend giving MMP Capital a buzz next time you have a financing conversation with your client."

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

 

S A R A S O T A ,   F L

"MMP Capital made my Equipment Purchase seamless and easy for me."

—  N O R T H   P A R K   D E N T A L   P . C .

"My experience with MMP Capital and particularly John Cipriano was

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK




experience. Efficient, effective, timely and with my best interest in mind. As we grow our business I am looking forward to working with John again in the near future. Thanks John!"

— DIAMOND CUT LAWNSCAPES





(516) 454-4570 • 19 ENGINEERS LN, FARMINGDALE, NY 11735



By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

# EXHIBIT 9

  

# About MMP Capital

MMP Capital was founded in 2013 with a mission to be the gold standard in equipment finance in the US. The ownership team has vast experience in sales, credit, and operations from several banks, leasing companies, and funding institutions. That diverse lending background has given MMP Capital a distinct advantage as a hybrid lender with it's ability to lend directly or utilize a vast syndication outlet. Our four pronged mission is to offer the best solutions to our employees, our customers, our vendor partners, and our key banking partners. Based on beautiful Long Island, MMP Capital is located 1 hour east from midtown Manhattan, and 1 hour west of the Hamptons. MMP Capital is not only the best place for all your financing needs, but is also a great place to start and build your career.

# Meet the Partners






## Smolenski



John-Paul M. Smolenski attended Purdue University, was nominated, and served as Captain of the Men's Track and Field Team in 2004-2005. Was Big Ten conference champion in 2005, an NCAA All American in 2005. Graduated with a Bachelors of Arts Degree in History, along with a Master's Degree in Educational Administration in 2006.

In 2007 Mr. Smolenski took the same principals of being an NCAA All American into the equipment finance industry, and took an entry level position at Direct Capital's new office on Long Island. After the recession of 2008, due to the economic turmoil from 2008- 2015 his time was invested in the financing of medical equipment. Spent 1 year as the East Coast Sales Manager at Baytree National Bank.

With the strong customer, vendor, and banking relationships that developed

  

partnership of James Siederman, and Michael McCaffrey and their expertise in the printing, and direct to consumer business, MMP Capital was born. Since July of 2013 Mr. Smolenski has served as the President and CEO of MMP Capital.

When not at work, he is happily married to his beautiful wife, with 3 children, and an English bulldog. He is a member of the Brookville Country Club, as well as an active member at the Maria Regina parish.



### James Siederman

James Siederman is a proficient and proven Sr. Vice President with expertise in direct & indirect sales. Documented strength in pursuit of new business opportunities, client relationship management, channel partner relations, and negotiating. James is a



building, sales management and operational management.

After beginning his career in 2007 at Direct Capital he partnered with John-Paul Smolenski and Mike McCaffrey to start MMP Capital in August of 2017. At Direct Capital he regularly exceeded goals achieving 146% to plan in 2008 and 200% to plan in 2009. He and his team members launched a vendor program strategy in the commercial printing space in 2010 that ultimately resulted in 17MM of incremental channel sales companywide and has been adopted since. James utilizes past success in areas such as vendor program management, prospecting, new business acquisition and mentorship to build exclusive lending relationships and drive sales. With over 12 years of experience in the commercial printing and direct to end user finance industry James understands what drives business and provides a tremendous





Economics from the University at Albany where he was also a member of the football program. North East Conference champions in 2002 & 2003. He is a devoted husband and proud father of 3 beautiful children. James enjoys sports and the opportunity to volunteer as the director of the local little league. He also coaches both basketball and football.



### Mike McCaffrey

Mike McCaffrey is an experienced Senior Vice President in the leasing industry. He is one of the founding partners of MMP Capital with Jim and John-Paul. In 2007, Mike graduated from University of Albany after being a member of the Football program. After graduation, he reconciled with his teammate, Jim, to get his start in the leasing



name for himself in Graphics Arts industry providing leasing options for customers of all credit distinctions. Mike earned his stripes building Direct Capital's portfolio, consistently earning President's Club distinctions before joining a small broker company with John-Paul and Jim. Continuing to provide excellent service to both customers, leasing partners and vendors alike, John-Paul, Jim, and Mike formed MMP Capital in 2017.

Mike currently resides in Tampa, FL where he relishes golfing in the Winter as a member of the Feather Sound Country Club. In his spare time, Mike tries to travel as much as he can domestically and internationally. He always makes time for youth sports coaching basketball, baseball and football amidst his travels. An avid New York Giants fan, Mike is a season-ticket holder and doesn't miss a home game.







Senior level equipment finance industry veteran skilled in operations and risk management, business planning, mergers and acquisitions, compliance and business development. 35 years of experience working with banks (Tokai Bank, Heartland Bank, Midland States Bank, State Bank), publicly traded specialty finance companies (Rockford Industries, Granite Financial) and private equity start-ups. Advanced degree from UCLA in Political Science and Government.





(516) 454-4570 • 19 ENGINEERS LN, FARMINGDALE, NY 11735



# EXHIBIT 10



EQUIPMENT FINANCE AGREEMENT
EFA No.:  __201906.9668__    Date:  __6/26/2019__

## EQUIPMENT ACCEPTANCE CERTIFICATE

| Customer Name | Customer Number | Transaction Number |
|---|---|---|
| ST. FRANCIS HOLDINGS, L.L.C. | | |

This certificate (the **Acceptance Certificate**) is entered into by the undersigned **Customer** (also **you** or **your**) in favor of **MMP Capital** (also **we**, **us** and **our**) in connection with the EFA, Lease, and/or other financing agreement identified by the Transaction Number above (the **Agreement**).  Any defined term not otherwise described herein shall have the same meaning ascribed to it in the Agreement or the other documents related thereto.

> As of the Acceptance Date set forth below, you hereby confirm that (i) the equipment listed in the attached Schedule A (the **Equipment**) has been delivered to you, installed, and/or is operating as intended, (ii) you unconditionally and irrevocably accept such Equipment and (iii) you understand and agree to be responsible for, perform and comply with, all of the obligations, terms and conditions of the Agreement and related documents.

In connection with your acceptance of the Equipment, you acknowledge and agree to the following:

1.  You selected the Equipment, accept it AS IS and WE MAKE NO EXPRESS OR IMPLIED WARRANTIES AS TO ITS MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE; you shall look only to the vendor/supplier of the Equipment (the **Vendor**) or manufacturer (not us) for any claim concerning the Equipment, which shall not relieve you from any obligations to us, including any payment obligations; and YOU HEREBY WAIVE AGAINST US, AND WE SHALL NOT BE LIABLE FOR ANY, CLAIM FOR LOSS, INJURY OR DAMAGE CAUSED BY THE EQUIPMENT, INCLUDING BUT NOT LIMITED TO, ALL SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES.

2.  You selected any software included on and/or within the Equipment (collectively, the **Software**); you assume all liability related to any unauthorized access or use of the Software and any data collected, stored, used or accessed by the Equipment and/or Software (the **Data**); we do not own or license any Software or Data; and we have no duty to configure, maintain and/or otherwise safeguard the Software and/or Data.

3.  Neither the Vendor nor any of its salespersons or other agents are agents of ours or are authorized to waive or modify any term or condition of this Acceptance Agreement, the Agreement and/or related documents.  Any representation as to the Equipment or any other matter made by the Vendor shall not in any way affect your duty to make payments to us and perform all your other obligations as set forth in the Agreement or the other documents related thereto.

**Execution.**  This document may be signed via digitally generated signatures and all signatures so generated, as well as those transmitted by facsimile, email, digital photography or other electronic means, shall for all purposes be deemed effective, binding, legally admissible and have the same effect as a manually applied ink signature.

ACCEPTANCE DATE: _26-June-2019_

CUSTOMER: ST. FRANCIS HOLDINGS, L.L.C.

ACCEPTED BY:

Signature:

Printed Name: Francis Averill

Title: Member



# EQUIPMENT FINANCE AGREEMENT

EFA No.: ___201906.9668___    Date: __6/26/2019__

| | |
|---|---|
| Creditor ("we", "us" and "our"): MMP Capital<br>1061 N. Broadway, Suite B<br>Massapequa, NY 11758 | Debtor ("you" or "your"):<br>ST. FRANCIS HOLDINGS, L.L.C.<br>802 N BELCHER RD, CLEARWATER, FL 33765 |
| Equipment Supplier: CynoSure<br>5 Carlisle Rd., Westford, MA 01886 | Equipment Location:<br>802 N BELCHER RD, CLEARWATER, FL 33765 |

**Financed Equipment Description:** Tempsure Workstation
The Collateral as generally described above and herein which Creditor and Debtor agree that a more detailed description of said Collateral being financed shall be maintained by us among our books and records in whatever more detailed description of the Collateral being financed is received from the supplier of such Collateral and, absent manifest error, such detailed description shall be considered incorporated into this EFA and shall be provided to Debtor within a reasonable time upon request.

| Advanced Payment (if any): $  99.00<br>Documentation Fee (if any): $  350.00 | Monthly Installment Payment:  6 PAYMENTS @ $99.00; FOLLOWED BY 60 PAYMENTS @ $3,349.29 | Term:  66  (Mos.) |
|---|---|---|

**Agreement.** Creditor agrees to lend to Debtor and you agree to borrower from us an amount for the financing of the Collateral. You authorize us to pay the supplier(s) for the Collateral. You authorize us to commence this EFA. You authorize us to insert or correct information in this EFA, including your proper legal name, address, serial numbers and any other information describing the Collateral. You acknowledge that the payment obligations hereunder have commenced notwithstanding that the Collateral may not been delivered, installed or accepted by you. Amounts received by us under this EFA shall be applied as we determine. Debtor promises to pay Creditor the Payments set forth above. Upon execution of this EFA, you will deliver to us the Advance Payment as set forth above, which you agree is non-refundable. To the extent permitted by law, we may charge you a fee not to exceed $350, plus any applicable sales/use tax, to cover documentation and credit investigation costs. Payments may be adjusted upward or downward no more than fifteen percent (15%) to reflect actual cost. The first Payment is due at the commencement of Creditor's applicable billing cycle as specified by the Creditor; each subsequent Payment is due on the same date of each preceding month until all Payments have been received by Creditor. Each date a Payment is due is a "Due Date" and along with the Payment due on the first Due Date, Debtor agrees to pay us a prorated rent for an amount equal to 1/30th of the Payment amount for each day calculated from the date Creditor paid the vendor until the first Due Date (the "Prorated Rent"). The Prorated Rent shall be due upon execution of this EFA. Any amount not paid when due is subject to a late charge of the greater of fifty dollars ($50.00) or ten percent (10%) of such delinquent amount, but not more than the highest rate allowed by law. You acknowledge and agree that you shall bear sole responsibility for and risk of loss on claim against and Lender shall have no liability in the event the Collateral is: (a) not delivered; (b) damaged during transit (c) not properly installed or functioning upon installation; (d) defective or otherwise fails to perform in accordance with Supplier's specifications; or (e) otherwise unacceptable to you for any other reason.

**Information; Credit Reports.** YOU AUTHORIZE US AND OUR ASSIGNEES TO OBTAIN CREDIT REPORTS AND MAKE CREDIT INQUIRIES AS WE DEEM NECESSARY. We will inform you upon request if we have sought a consumer credit report and the name and address of any credit reporting agency that provided a report. You agree that we may request and use additional credit reports to update our information without further notice to you as long as you have obligations under this Agreement. Upon our request, you agree to provide us with statements setting forth your financial condition and operations. You warrant that all information you have and will deliver to us, including the information in this Agreement, is true, accurate and correct and you acknowledge that we are relying on such information to enter into this Agreement.

**Grant of Security Interest.** You hereby grant us a perfected, first priority security interest in the Collateral, all accession and additions thereto, replacements or substitutions thereof, and all proceeds to secure all of your obligations under this EFA.

**Disclaimer of Warranties and Claims.** We make no representation or warranty to any matter whatsoever including the merchantability or fitness for particular purpose the Collateral. This EFA is irrevocable. **Your obligation to pay all amounts hereunder is non-cancellable, absolute, and unconditional and will not be subject to any reduction, setoff, defense, counterclaim, deferment or recoupment for any reason, even if the Collateral is damaged, destroyed or defective.** You acknowledge you selected the Collateral and the supplier and your supplier is not our agent, nor are we their agent. You acknowledge that no one, including the supplier, has been authorized to waiver or change any term or condition of this EFA. No representation by the supplier as to any matter shall bind us or affect your duty to pay all amounts and perform all obligations hereunder. You will use the Collateral for commercial purposes only, in compliance with the law and not for any personal, family or householduse.

**Collateral.** You will not modify or change the location of the Collateral without our proper consent and allow us to inspect it upon our request. At your expense, you will maintain the Collateral in good operating condition and repair. You will keep the Collateral free and clear of all liens and encumbrances. Titled Collateral will be titled and/or registered as we direct. You are responsible for any damage or destruction to the Collateral. You will at our election repair the Collateral at your expense or pay to us all amounts then due and owing plus the total of all unpaid Payments for the Term, discounted at the lower of 3% or the then current discount rate of the Federal Reserve Bank of New York as calculated by us.

**Fees and Taxes.** You agree to pay when due and to hold us harmless from all taxes, interest and penalties relating to this EFA and the Collateral ("Taxes") and reimburse us for those Taxes we pay on your behalf. If we pay any of the above for you, you agree to reimburse us and pay us a processing fee for each payment we make on your behalf. In addition, you also agree to pay us any filing fees prescribed by the Uniform Commercial Code (UCC) in other law and reimburse us for all costs and expenses involved in documenting and servicing this transaction. You also acknowledge that in addition to the other obligations due under this EFA, we may assess and you may be required to pay additional taxes and/or fees including an invoice fee. Such fees may not only cover our costs, they may also include a profit.

**Insurance.** You agree to obtain and maintain at your expense property insurance for the full replacement value of the Equipment, protecting the Equipment against Loss, and liability insurance, in an amount acceptable to us, but in no event less than $500,000 covering any injury, death or third-party property damage arising out of or relating to use of the Equipment. If the Equipment should be titled under title registration laws ("Mobile") then you shall obtain and maintain all risk physical damage insurance. All insurance policies must provide that no cancellation shall be effective without thirty (30) days' prior written notice to us. At our request, you agree to name any party who may have a security interest in the Equipment as Lender's Loss Payee. You agree to provide proof of insurance to us upon request. You hereby grant us a limited power of attorney allowing us to make a claim for, receive payment on, and endorse or execute for our benefit any instrument representing proceeds from any policy issued on the Equipment. IF YOU FAIL TO PROVIDE PROOF OF INSURANCE ACCEPTABLE TO US, WE HAVE THE RIGHT BUT NOT THE OBLIGATION TO SECURE INSURANCE IN SUCH FORM AND AMOUNT AS WE DEEM NECESSARY. YOU AGREE THAT IN ADDITION TO INSURANCE PREMIUMS WE MAY CHARGE YOU INTEREST AT 25% PER MONTH AND/OR AN ADMINISTRATIVE FEE WHICH MAY RESULT IN A PROFIT TO US. YOU UNDERSTAND THAT IF WE PROCURE INSURANCE YOU MAY PAY MORE THAN IF YOU HAD PROCURED INSURANCE AND THE INSURANCE MAY NOT NAME YOU AS AN INSURED AND MAY NOT FULLY PROTECT YOU IN THE EVENT OF A LOSS. YOU AGREE THAT DISPUTES REGARDING INSURANCE OR FEES CHARGED FOR PROCURING INSURANCE WILL BE DETERMINED BY ARBITRATION CONDUCTED IN SEATTLE, WASHINGTON UNDER THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION.

**Debtor Indemnification.** You hereby agree to defend, indemnify and hold us and our agents, successors, assignees and employees harmless from any and all liability, damage, penalty, claims, actions, expenses, disbursements or loss, including attorneys' fees and court costs, arising out of or relating to this EFA, liabilities you have assumed hereunder, and the purchase, sale, financing, ownership, selection, installation, design, licensing, possession, operation, control, use, maintenance, servicing, repair, storage, shipment, transportation or delivery of the Collateral. The indemnities contained herein shall survive the expiration or other termination of this EFA.

**Default and Remedies.** If any one of the following occurs, you will be in default: (i) you fail to pay any amount under this EFA when due; (ii) you cease doing business, admit your inability to pay your debts, or you file or have filed against you a petition under the Bankruptcy Code; (iii) you breach any other obligation contained in this EFA; (iv) a writ or order of attachment or execution or other legal process is levied on or charged against the Collateral which is not released or satisfied within 10 days; or (v) any of the above events of default occur with respect to any guarantor. Upon your default, we may do any of the following: (a) terminate this EFA; (b) foreclose on our security interest and require you to immediately turn over the Collateral to us, or we may peaceably repossess the same without liability for trespass, and upon receipt of the Collateral, sell the Collateral at terms we determine at one or more private sales, and apply the net proceeds (after deducting any related expenses) to your payment obligations, and you will remain liable for any deficiency with any excess being retained by us; (c) declare all sums due and to become due hereunder immediately due and payable, all future Payments discounted at the lower of three percent (3%) or the then-current discount rate of the Federal Reserve Bank of New York as calculated by us; (d) sell, dispose of, hold, or lease the Collateral; (e) exercise any other right or remedy which may be available to us under applicable law. You shall reimburse us for all costs we incur in enforcing our rights (including our attorneys' fees) and costs of repossession, repair, storage and remarketing of the Collateral. A waiver of default will not be a waiver of any other subsequent default.

**General.** This EFA shall be governed and construed under the laws of the State of New York (NY), without reference to its principle of conflicts of laws and is deemed to have been performed in Nassau County, NY. You submit to the jurisdiction of NY and agree that the state and federal courts sitting in Nassau County, New York, shall have the exclusive jurisdiction over any action or proceeding to enforce this EFA or any action or proceeding arising under this EFA. You acknowledge the jurisdiction may change at the sole discretion of MMP Capital's successors and/or assigns. You waive any objection based upon improper venue and/or forum non-conveniens. You irrevocably grant us the right to make such filings under the UCC as we deem necessary. In addition to any late charges described herein, you agree to pay us interest on all past due amounts at the lower of 1.5% per month or the highest rate allowed by law. You will not assign your rights under this EFA, or permit the Collateral to be used by anyone but you. We may assign this EFA, in whole or in part, without notice to you or your consent. You agree that our assignee will have the same rights and benefits that we have now, but will not be subject to any claims, defenses or set offs that you may have against us. This EFA sets forth the entire understanding of the parties with respect to its subject matter and may only be amended in writing signed by both parties, except as otherwise stated in the section above titled "Agreement." You represent and warrant to us that (i) this EFA constitutes a legal, valid, and binding obligation, enforceable against you in accordance with its terms; (ii) you have the ability to perform all of your obligations under this EFA; and (iii) all information conveyed to us in connection with this EFA and all related documents whether by you, a guarantor, a supplier or any other person, is true, accurate, complete and not misleading. This EFA may be executed in separate counterparts, which together shall be the same instrument. You agree this EFA may be signed electronically pursuant to the Electronic Signatures in Global and National Commerce Act and other applicable law. All fees may not only cover our costs but may include a profit. As long as you are not in default under this EFA, you may repay this EFA by paying an amount equal to the sum of any and all remaining Payments and any and all other fees currently due and payable. If Debtor constitutes more than one person, the liability of each shall be joint and several. A copy of this EFA (whether delivered by facsimile, in portable document format (PDF) or otherwise) shall be deemed an original for all purposes. Any notice given hereunder shall be in writing and deemed given two business days after being deposited with the US Postal Service, first class postage prepaid, and addressed to the Debtor or Creditor (as the case may be) at its address set for above, or such other address given to the sender by written notice. MMP Capital Inc is a registered New York corporation. Each party waives its right to a jury trial.

# MMP CAPITAL

**EQUIPMENT FINANCE AGREEMENT**
EFA No.: ___201906.9668___    Date: _6/26/2019_

By signing below, Debtor hereby irrevocably accepts the Collateral under the EFA and irrevocably authorizes Creditor to pay the supplier on behalf of the Debtor. The person executing this EFA is authorized to do so, making this EFA the valid binding act of the Debtor.

| Debtor: ST. FRANCIS HOLDINGS, L.L.C. | Accepted by MMP Capital |
|---|---|
| By: | By: |
| Print Name: Francis Averill | Print Name: JOHN-PAUL SMOLENSKI |
| Title: Member    Date: | Title: PRESIDENT |
| Debtor Tax ID: 42-1711873 | Date: |

**GUARANTY:** In consideration of Creditor entering into the EFA, the undersigned, together and separately, unconditionally, personally and irrevocably guarantee to Creditor the prompt payment and performance of all Debtor's obligations under the EFA. You agree that this is a guaranty of payment, not collection, and that Creditor can proceed directly against you without first proceeding against Creditor or the Collateral. You waive notice of acceptance, acceleration and default and all defenses, including protest, presentment and demand. Creditor may renew, extend or otherwise change the terms of the EFA without notice to you and you will be bound by such changes, and you will pay all of Creditor's costs of enforcement and collection, including reasonable attorneys' fees. This Guaranty is binding on your heirs, administrators, representatives, successors and assigns and survives the insolvency, bankruptcy or discharge from bankruptcy of Debtor. THIS GUARANTY WILL BE GOVERNED BY NEW YORK LAW. YOU AGREE TO JURISDICTION AND VENUE IN THE STATE AND FEDERAL COURTS AS SET FORTH IN THE EFA.

| Guarantor's Signature: | Print Name: Francis Averill | Date: |
|---|---|---|
| Guarantor's Signature: | Print Name: | Date: |

**AUTHORIZATION FOR ACH PAYMENTS:** Debtor hereby authorizes and requests MMP CAPITAL ("Creditor"), and/or its successors or assigns, to initiate electronic debit entries or effect a change by any other commercially accepted practice, to the account indicated below, and hereby authorize the named below financial institution ("Bank") to honor the debit entries initiated by Creditor or its assignee and debit the same to such account. This authorization is to remain in full force and effect until such time that Creditor has received written notification from Debtor of its termination in such time and in such manner as to afford Creditor and the Bank a reasonable opportunity to act on same. Debtor understands that the withdrawal of this authorization without the written consent of Creditor shall constitute default of the Equipment Finance Agreement for which this payment is being made.

| Debtor Bank Name: | | Bank Phone #: ( ) | |
|---|---|---|---|
| Address: | | City:    State:    Zip: | |
| Name on Account: | | ABA #: | Bank Account #: |
| By: | Print Name: Francis Averill | Title: Member | Date: |

**PLEASE COMPLETE THE BELOW STATEMENT OF AUTHORITY IF APPLICABLE.**

**CORPORATE OR LIMITED LIABILITY COMPANY STATEMENT OF AUTHORITY**

This Statement of Authority is executed pursuant to the Business Corporations Act or Limited Liability Company Act (as the case may be) of the state of _____ FL
Regarding    ST. FRANCIS HOLDINGS, L.L.C.    (the "Company").

The following persons are the Directors or Officers of the Company or Members, Managers or Officers of the Company (as the case may be) and have full power and authority to act on behalf of the Company and execute all instruments on behalf of the Company and to any contract, including, but not limited to, this Equipment Finance Agreement.

| Print Name | Title | Signature |
|---|---|---|
| Francis Averill | Member | |

The authority of the foregoing persons to bind the Company is not limited.

Executed this ____ day of _____, 20____

| By: | Print Name: Francis Averill | Title: Member |
|---|---|---|

# EXHIBIT 11

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>CSC    1-800-858-5294 |
| --- |
| B. E-MAIL CONTACT AT FILER (optional)<br>SPRFiling@cscglobal.com |
| C. SEND ACKNOWLEDGMENT TO:  (Name and Address)<br><br>┌ 1670 46836<br>CSC<br>801 Adlai Stevenson Drive<br>Springfield, IL 62703      Filed In: Florida<br>└                                (S.O.S.) |

FLORIDA SECURED TRANSACTION REGISTRY
**FILED**
2019 Jul 17 10:25 AM
****** 201909161215 ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1 DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME St. Francis Holdings, L.L.C. | | | | |
| --- | --- | --- | --- | --- |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 802 N Belcher Rd | CITY Clearwater | STATE FL | POSTAL CODE 33765 | COUNTRY USA |

2 DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME Amur Equipment Finance, Inc. | | | | |
| --- | --- | --- | --- | --- |
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 308 N. Locust Street Suite 100 | CITY Grand Island | STATE NE | POSTAL CODE 68801 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
TempSure workstation with the Vitalia Upgrade SN TSRF00005173

The equipment financed under Contract 948659listed above, whether now owned or hereafter acquired, together with all personal property installed in, affixed to or used in connection therewith and all present and future: (i) additions, accessories, accessions, attachments, parts, supplies, related software, intellectual property, rights, licenses and improvements thereto; (ii) substitutions, renewals, replacements and purchase options thereof; (iii) insurance, warranty, and other third-party claims; (iv) Debtor's rights in connection with a third-party's use of such equipment under a sublease, rental or similar agreement; (v) proceeds and product in any form (including but not limited to insurance and sale proceeds) of each of the foregoing, whether it be cash, non-cash or in any other form; and (vi) to the extent the equipment identified herein is construed as or deemed inventory, that inventory and all accounts, accounts receivable, cash proceeds and all other proceeds related thereto or derived therefrom.

| 5. Check only if applicable and check only one box: Collateral is ☐ | held in a Trust (see UCC1Ad, item 17 and Instructions) | | being administered by a Decedent's Personal Representative | |
| --- | --- | --- | --- | --- |
| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien    ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |
| 8. OPTIONAL FILER REFERENCE DATA: | | | | 1670 46836 |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# EXHIBIT 12



A Hologic Company

5 Carlisle Road
Westford, MA 01886
www.cynosure.com

August 30, 2019

**VIA FEDERAL EXPRESS AND E-MAIL**

Rose Averill, CEO
St. Francis Sleep, Allergy & Lung Institute
802 North Belcher Road
Clearwater, FL 33765
RAverill@StFrancisMed.com

      Re:    Cynosure Devices

Dear Ms. Averill:

I am writing on behalf of Cynosure, LLC (f/k/a Cynosure, Inc.) ("Cynosure") in response to your various correspondence to employees at both Cynosure and Hologic, Inc. regarding your purchase of a SculpSure Non-Invasive Body Contouring Platform ("SculpSure System") and a TempSure RF System ("TempSure System"). As you are aware, the terms of your signed Customer Purchase Agreements for the SculpSure System and the TempSure System, dated June 26, 2019 and June 25, 2019, respectively, state clearly that **"All Sales are final. Cynosure Grants no right of return."** Accordingly, we remain unable to accept a return of your SculpSure System or TempSure System. Additionally, because Cynosure is not a party to the financing arrangements with Pawnee Leasing or Amur Equipment Finance, Cynosure is unable to amend the terms or otherwise release you from any obligations thereunder.

We are understanding of the trepidation that often comes with developing a new medical aesthetics practice because we have partnered with hundreds of practices similar to yours. We are excited to provide the expertise and know-how to help ensure that you can successfully leverage your SculpSure System and TempSure System. We remain ready and able to provide our world-class training so that your staff is equipped with the tools necessary to achieve the best results for your patients. In addition to the resources afforded to you through our Practice Transformation Plan, we'd also like to work with you to discuss additional marketing opportunities, including leveraging materials and press highlighting our new celebrity partnership with Brooke Shields, which has been a huge hit with practices and patients alike.

I apologize for our delay in issuing your marketing rebate check negotiated as part of you SculpSure System and TempSure System purchase. I've instructed our finance team to move forward with processing your rebate in the amount of $26,750. You should expect a check within the next 7-10 business days.

In closing, I hope that we can move forward together to help build your practice. I've seen firsthand what a partnership with Cynosure has done to bolster other practices and cannot wait to get started with St. Francis.

Sincerely,

Erik Anderson
President

# EXHIBIT 13



**Law Offices of**

# Averill
# Law Firm

Francis J. Averill, Attorney at Law

Frank Averill, M.D., J.D.
802 North Belcher Road
Suite A
Clearwater, FL 33765

Phone 727.447.3000
Fax 727.210.4609
www.FLLegalMed.com
FAverill@FLLegalMed.com

August 7, 2019

TO: Cynosure, a Hologic Company and related entities including Pawnee Leasing Corporation; MMP Capital

Re: Cynosure sales and/or lease of consumer goods or services solicited at Miami Conference ending August 4, 2019 and earlier solicitation made at my medical practice in Clearwater, Florida.

## NOTICE OF CANCELLATION OF ALL CONTRACTS FOR SERVICES WITH CYNOSURE AND ANY RELATED ENTITY

Florida Statute 501.021 gives all Florida consumers the right to cancel, within three business days, a sale, lease or rental of consumer goods or services in excess of $25 in which the sale occurs in a personal solicitation at a place other than the seller's fixed location business establishment and the buyer's agreement to purchase is consummated at a place other than the seller's fixed location business establishment.

We are exercising our rights under Florida law to cancel all purchases made at the hotel conference in Miami Beach, Florida over the Aug. 3-4, 2019 weekend.

Further, in light of the nature of the presentations and solicitations at the hotel conference, we find that the solicitations made at our medical practice were unconscionable, deceptive and unfair in their misrepresentations about the suitability of the Cynosure products for a practice such as ours and were intended only to deceive and induce us into a purchase.

The Sculpsure and Tempsure equipment have not been used and will be returned to Cynosure as per your instructions. No delivery was scheduled for the remaining equipment including Icon, Picosure and Nitronox. You are hereby notified not to ship the equipment. DHL has already been notified that we will not be accepting delivery of the equipment.

Hopefully, this issue can be resolved amicably, and all parties can be returned to their prior position. We do not want to become involved in litigation, involving these issues or any similar claims that have been filed against Cynosure, but we will defend our position with all legal and non-legal remedies available if this issue is not resolved between all affected parties.

Respectfully,

Francis Averill, M.D., J.D.

**Cassy Moreau**

| | |
|---|---|
| **From:** | Cassy Moreau |
| **Sent:** | Wednesday, August 07, 2019 2:36 PM |
| **To:** | 'patrick.ryan@hologic.com'; 'khouston@cynosure.com'; 'mike.russo@cynosure.com'; 'info@cynosure.com'; 'kristopher.huston@hologic.com' |
| **Cc:** | Frank Averill; Rose Averill; Cesar Fernandez |
| **Subject:** | URGENT- Cancellation Notice |
| **Attachments:** | signed-CynosureCancellationNotice.pdf |
| | |
| **Importance:** | High |

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | 'patrick.ryan@hologic.com' | | |
| | 'khouston@cynosure.com' | | |
| | 'mike.russo@cynosure.com' | | |
| | 'info@cynosure.com' | | |
| | 'kristopher.huston@hologic.com' | | |
| | Frank Averill | Delivered: 8/7/2019 2:36 PM | |
| | Rose Averill | Delivered: 8/7/2019 2:36 PM | |
| | Cesar Fernandez | Delivered: 8/7/2019 2:36 PM | Read: 8/8/2019 12:16 PM |

Good afternoon:

Attached please find our official Cancellation Notice.

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

1

**Cassy Moreau**

| | |
|---|---|
| **From:** | Cassy Moreau |
| **Sent:** | Wednesday, August 07, 2019 3:00 PM |
| **To:** | 'eric.anderson@hologic.com' |
| **Cc:** | Frank Averill; Rose Averill; Cesar Fernandez; 'patrick.ryan@hologic.com'; 'khouston@cynosure.com'; 'mike.russo@cynosure.com'; 'info@cynosure.com'; 'kristopher.huston@hologic.com' |
| **Subject:** | URGENT- Cancellation Notice (Cynosure) |
| **Attachments:** | signed-CynosureCancellationNotice.pdf |
| **Importance:** | High |

| Tracking: | Recipient | Delivery | Read |
|---|---|---|---|
| | 'eric.anderson@hologic.com' | | |
| | Frank Averill | Delivered: 8/7/2019 3:01 PM | |
| | Rose Averill | Delivered: 8/7/2019 3:01 PM | |
| | Cesar Fernandez | Delivered: 8/7/2019 3:01 PM | Read: 8/8/2019 12:16 PM |
| | 'patrick.ryan@hologic.com' | | |
| | 'khouston@cynosure.com' | | |
| | 'mike.russo@cynosure.com' | | |
| | 'info@cynosure.com' | | |
| | 'kristopher.huston@hologic.com' | | |

Good afternoon:

Attached please find our official Cancellation Notice.

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have

1

received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

## Cassy Moreau

| | |
|---|---|
| **From:** | Cassy Moreau |
| **Sent:** | Wednesday, August 07, 2019 3:03 PM |
| **To:** | 'INFO@MMPCAPITAL.COM' |
| **Cc:** | Frank Averill; Rose Averill; Cesar Fernandez |
| **Subject:** | URGENT- Cancellation Notice (MMP Capital) |
| **Attachments:** | signed-CynosureCancellationNotice.pdf |
| | |
| **Importance:** | High |

**Tracking:**

| Recipient | Delivery | Read |
|---|---|---|
| 'INFO@MMPCAPITAL.COM' | | |
| Frank Averill | Delivered: 8/7/2019 3:03 PM | |
| Rose Averill | Delivered: 8/7/2019 3:03 PM | |
| Cesar Fernandez | Delivered: 8/7/2019 3:03 PM | Read: 8/8/2019 12:16 PM |

Good afternoon:

Attached please find our official Cancellation Notice.

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

**Cassy Moreau**

| | |
|---|---|
| **From:** | Cassy Moreau |
| **Sent:** | Wednesday, August 07, 2019 2:47 PM |
| **To:** | 'arrow@pawneeleasing.com' |
| **Cc:** | Frank Averill; Rose Averill; Cesar Fernandez |
| **Subject:** | URGENT- Cancellation Notice (Pawnee Leasing corporation) |
| **Attachments:** | signed-CynosureCancellationNotice.pdf |

| **Importance:** | High |
|---|---|

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | 'arrow@pawneeleasing.com' | | |
| | Frank Averill | Delivered: 8/7/2019 2:48 PM | |
| | Rose Averill | Delivered: 8/7/2019 2:48 PM | Read: 8/7/2019 8:36 PM |
| | Cesar Fernandez | Delivered: 8/7/2019 2:48 PM | Read: 8/8/2019 12:16 PM |

Good afternoon:

Attached please find our official Cancellation Notice.
Re: contract# 369964

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.



**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

WESTFORD, MA 01886

Certified Mail Fee  $3.50    0145 10
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)  $ $0.00
☐ Return Receipt (electronic)  $ $0.00
☐ Certified Mail Restricted Delivery  $ $0.00
☐ Adult Signature Required  $ $0.00
☐ Adult Signature Restricted Delivery $ $0.00
Postage  $0.55
Total Postage and Fees  $6.85

Postmark Here

08/07/2019

Sent To Mike Russo / Cynosure
Street and Apt. No., or PO Box No. 5 Carlisle Road
City, State, ZIP+4® Westford, MA 01886

PS Form 3800, April 2015 PSN 7530-02-000-9047  See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

WESTFORD, MA 01886

Certified Mail Fee  $3.50    0145 10
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)  $ $0.00
☐ Return Receipt (electronic)  $ $0.00
☐ Certified Mail Restricted Delivery  $ $0.00
☐ Adult Signature Required  $ $0.00
☐ Adult Signature Restricted Delivery $ $0.00
Postage  $0.55
Total Postage and Fees  $6.85

Postmark Here

08/07/2019

Sent To Eric Anderson / Cynosure
Street and Apt. No., or PO Box No. 5 Carlisle Road
City, State, ZIP+4® Westford, MA 01886

PS Form 3800, April 2015 PSN 7530-02-000-9047  See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

GRAND ISLAND, NE 68801

Certified Mail Fee  $3.50    0145 10
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)  $ $0.00
☐ Return Receipt (electronic)  $ $0.00
☐ Certified Mail Restricted Delivery  $ $0.00
☐ Adult Signature Required  $ $0.00
☐ Adult Signature Restricted Delivery $ $0.00
Postage  $0.55
Total Postage and Fees  $6.85

Postmark Here

08/07/2019



Sent To Amur Equipment Finance, Inc
Street and Apt. No., or PO Box No. 308 North Locust St suite 100
City, State, ZIP+4® Grand Island, NE 68801

PS Form 3800, April 2015 PSN 7530-02-000-9047  See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

MIAMI, FL 33197

Certified Mail Fee  $3.50    0145 10
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)  $ $0.00
☐ Return Receipt (electronic)  $ $0.00
☐ Certified Mail Restricted Delivery  $ $0.00
☐ Adult Signature Required  $ $0.00
☐ Adult Signature Restricted Delivery $ $0.00
Postage  $0.55
Total Postage and Fees  $6.85

Postmark Here

08/07/2019



Sent To Amur Equipment Finance
Street and Apt. No., or PO Box No. PO Box 979285
City, State, ZIP+4® Miami, FL 33197

PS Form 3800, April 2015 PSN 7530-02-000-9047  See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

MARLBOROUGH, MA 01752

Certified Mail Fee  $3.50    0145 10
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)  $ $0.00
☐ Return Receipt (electronic)  $ $0.00
☐ Certified Mail Restricted Delivery  $ $0.00
☐ Adult Signature Required  $ $0.00
☐ Adult Signature Restricted Delivery $ $0.00
Postage  $0.55
Total Postage and Fees  $6.85

Postmark Here

08/07/2019

Sent To HD's, Inc. Headquarters
Street and Apt. No., or PO Box No. 350 Campus Drive
City, State, ZIP+4® Marlborough, MA 01752

PS Form 3800, April 2015 PSN 7530-02-000-9047  See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

SAN DIEGO, CA 92121

Certified Mail Fee  $3.50    0145 10
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)  $ $0.00
☐ Return Receipt (electronic)  $ $0.00
☐ Certified Mail Restricted Delivery  $ $0.00
☐ Adult Signature Required  $ $0.00
☐ Adult Signature Restricted Delivery $ $0.00
Postage  $0.55
Total Postage and Fees  $6.85

Postmark Here

08/07/2019

Sent To HD's, Inc.
Street and Apt. No., or PO Box No. 10240 Genetic Center Drive
City, State, ZIP+4® San Diego, CA 92121

PS Form 3800, April 2015 PSN 7530-02-000-9047  See Reverse for Instructions





# EXHIBIT 14

**Cassy Moreau**

| | |
|---|---|
| **From:** | Tammie Dopler <Tammie@pawneeleasing.com> |
| **Sent:** | Thursday, August 08, 2019 11:22 AM |
| **To:** | Frank Averill |
| **Cc:** | Cassy Moreau; Rose Averill; Cesar Fernandez |
| **Subject:** | RE: 369964 FW: URGENT- Cancellation Notice (Pawnee Leasing corporation) |
| **Attachments:** | 369964.pdf |

Mr. Averill,

I am in receipt of your letter dated August 7, 2019.  Unfortunately you signed a non-cancellable commercial lease agreement with Pawnee that you personally guaranteed. You also signed the "pre-installation" agreement on 6/26/19 which authorized us to pay the vendor. The vendor was paid in full on 7/11/19.

I have reached out to the broker and vendor and have been informed they will not be refunding Pawnee.  The best I can do for you at this point is to offer a one-time settlement and if you feel you have reason to pursue the vendor for your losses, you may do so.

As of today, the pay-off on your lease is $258,031.51. (attached)  I would be willing to accept $245,000.00 if paid in full by August 30, 2019 and there would be no derogatory credit reporting.

Please let me know if this something you would like to do.

Thank you,


**Tammie Dopler**
**A/R Advanced Collector**


V: 800-864-4266 ext 213
Fax: 970-224-1105

Pawnee Leasing Corporation
3801 Automation Way, Suite 207
Ft. Collins CO 80525
a Chesswood Group Limited company
www.pawneeleasing.com
tammie@pawneeleasing.com
Learn about Pawnee's email encryption service by clicking here.




This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

**From:** Tresa Garcia **On Behalf Of** Customer Service
**Sent:** Wednesday, August 7, 2019 1:32 PM
**To:** Tammie Dopler <Tammie@pawneeleasing.com>
**Subject:** 369964 FW: URGENT- Cancellation Notice (Pawnee Leasing corporation)
**Importance:** High


**From:** Cassy Moreau [mailto:FinanceManager@stfrancismed.com]
**Sent:** Wednesday, August 7, 2019 12:48 PM
**To:** Customer Service <Customerservice@pawneeleasing.com>
**Cc:** Frank Averill <FAverill@stfrancismed.com>; Rose Averill <raverill@stfrancismed.com>; Cesar Fernandez <OperationsManager@stfrancismed.com>
**Subject:** URGENT- Cancellation Notice (Pawnee Leasing corporation)
**Importance:** High

Good afternoon:

Attached please find our official Cancellation Notice.
Re: contract# 369964

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.



**PAWNEE**
LEASING CORPORATION

## PAYOFF QUOTATION

As of: **08/08/2019**

Contract No.    369964

Customer:    ST. FRANCIS HOLDINGS, L.L.C.

Equipment:    SCULPSURE CONTOURING PLATFORM

Payments Started:    08/01/2019

| | |
|---|---|
| Remaining Balance: | 240,136.60 |
| | |
| Remaining Balance, Discounted 4% Present Value for Early Payoff | 216,226.58 |
| Purchase Option | 21,785.60 |
| Returned Payments | 0.00 |
| Open Property Tax Charges ** | 0.00 |
| Estimated Final Personal Property Tax | 0.00 |
| | -------------------- |
| Total Contract Obligation | 238,012.18 |
| | |
| Tax on Contract Obligation | 16,660.85 |
| Other Miscellaneous Charges Due ** | 3,263.48 |
| Termination Fee | 95.00 |
| | -------------------- |
| Total Due | 258,031.51 |
| | |
| Less Security Deposit | -    0.00 |
| Overpayments | -    0.00 |
| | -------------------- |
| Net Payoff Due | 258,031.51 |

**Note:  Payoff is good through 08/29/2019**

### CHARGE DETAIL **

12-11-19 SALES AND USE TAXES        213.50    12-11-19 INTERIM RENT        3,049.98

*Liens or titles will be released upon clearance of payment for all amounts due under the contract.*
*For contracts with UCC filings the secured party will promptly file a UCC-3 termination statement and copies will be provided.*

3801 Automation Way Suite 207 • Fort Collins, CO  80525 • 1-800-864-4266 • Fax 1-970-224-1105
arrow@PawneeLeasing.com • www.PawneeLeasing.com

